**Clifton BLECHA, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 97SC20.**

Supreme Court of Colorado, En Banc.

June 15, 1998.

As Modified on Denial of Rehearing July 27, 1998.

Rehearing Denied Aug. 10, 1998.

David F. Vela, Colorado State Public Defender, Katherine Brien, Deputy State Public Defender, Denver, for Petitioner.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, John Daniel Dailey, Deputy Attorney General, Robert Mark Russel, First Assistant Attorney General, Matthew S. Holman, Assistant Attorney General, Criminal Enforcement Section, Denver, for Respondent.

Justice BENDER delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' decision in *People v. Blecha*, 940 P.2d 1070 (Colo.App.1996), to determine whether the hearsay statement of a previously acquitted co-defendant, Roger Younger (Younger), was properly admitted at the trial of the defendant-appellant, Clifton Blecha (Blecha). A jury convicted Blecha of first degree murder and conspiracy to commit first degree murder of a fellow inmate at the Limon Correctional Facility. The court of appeals held that the admission of Younger's statements was erroneous since the statements qualified neither as co-conspirator hearsay nor as declarations against interest. Finding that this evidentiary error did not "affect the substantial rights of the defendant," the court of appeals concluded that the error was harmless and affirmed Blecha's conviction. *Id.* at 1075.

We affirm the court of appeals' determination that the district court erred when it admitted Younger's hearsay statements. However, the admission of Younger's hearsay statements violated Blecha's right to confrontation under Article II, Section 16 of the Colorado Constitution. The appropriate standard of review for an error of constitutional dimension is whether, after examining the record, an appellate court can declare a belief that the error was harmless beyond a reasonable doubt and not whether the error substantially affected the verdict or the fairness of the proceedings. After careful scrutiny of the entire record we hold that this constitutional error was harmless beyond a reasonable doubt. Hence, we affirm the court of appeals' decision upholding Blecha's conviction.

## I. FACTS

At the trial, an inmate eyewitness to the murder, Joseph Bates (Bates), testified to two hearsay statements made by a previously acquitted co-defendant, Younger. These statements form the basis of Blecha's appeal and require a detailed discussion of the facts.

On July 13, 1992 at approximately 9:15 p.m., staff members of the Limon Correctional Facility (LCF) found inmate Daniel Shettler (the victim) dead in his cell, lying under the covers of his upper bunk bed. The staff members discovered the body as the result of a "lockdown" of the facility that occurred at 7:00 p.m.[1] An investigation revealed that the victim was strangled by a ligature surrounding his neck, and that the time of death was approximately between 6:00 p.m. and 9:30 p.m. on July 13, 1992.

The evening of the death, investigators found a four-foot long coaxial cable[2] in an inmate trash can located in the gymnasium bathroom. The cable was consistent with the ligature marks around the neck of the victim. Investigators also retrieved a small piece of silver wire from the victim's bedding possessing similar physical characteristics to the ca-

ble found in the trash can. Subsequent investigation revealed a latent palm print of inmate James Green (Green) on the ladder leading to the victim's bunk.

The victim lived in a three-tiered pod that housed approximately fifty inmates, including Blecha, Younger, and Green. On the day of the murder, all fifty inmates were permitted to move freely throughout the pod between a lockdown that occurred at 4:00 p.m. and the lockdown that occurred at 7:00 p.m. In the days following the murder, investigators questioned all fifty inmates. During these interviews, the investigators learned of a rumor among the prisoners that the victim was killed because he was an informant in a murder that occurred six months earlier at a different prison, the Fremont Correctional Facility (FCF). Three inmates—Richard Lofton (Lofton), Randy Kailey (Kailey), and William Humphries—told investigators that Blecha, Younger, and Green killed the victim. Another inmate, Michael Ford (Ford), implicated three other inmates. However, the investigators later discounted this information. Investigators also learned that the victim's cellmate was taken from his cell by another inmate to the prison library before the murder occurred.

In August of 1992, Bates told the chief investigating officer that shortly after the murder, Younger threatened his life and told him to keep his mouth shut. The officer's opinion was that Bates feared for his life from the day of the murder until he was subsequently transferred from LCF to another facility.

In October of 1992, Blecha, Younger, and Green were charged with murder and conspiracy to commit murder. Blecha moved to exclude Younger's hearsay statements from trial, contending that the admission of these statements was prohibited by CRE 802 and by the confrontation clauses of the United States and Colorado Constitutions.

After a hearing, the district court ruled that Younger's statements were admissible

---

**1.** A "lockdown" is a stand-up count of the inmates conducted by prison staff during which all inmate movement ceases. Inmates who are not in their cells are escorted by a guard to their respective cells. Inmates may not leave their cells unless accompanied by a correctional officer.

**2.** A coaxial cable is a common television cable.

as the nonhearsay statements of a co-conspirator under CRE 801(d)(2)(E). The district court then addressed Blecha's assertion that admission of these statements violated the confrontation clauses of the United States and Colorado Constitutions under the two-part test articulated in *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980). First, the district court found that Younger was not available to testify at trial because, at the time of the pretrial hearing, Younger was protected by the Fifth Amendment privilege against self-incrimination due to the pending murder and conspiracy charges against him. Second, the district court determined that Younger's statements possessed sufficient independent indicia of reliability to overcome the presumption of unreliability that attaches to hearsay statements. Thus, the district court held that the admission of Younger's statements was appropriate under the Colorado and federal constitutions.

After this hearing, the district court severed the trials of each of the three co-defendants. In August of 1993, Younger was acquitted of all charges. Blecha's case proceeded to trial in November of 1993.

At Blecha's trial, the prosecution submitted the results of the investigation, set forth above, into evidence. The prosecution's theory was that the victim was killed pursuant to the order of the vice-president of the Aryan Brotherhood, a prison gang. Mike Schneider (Schneider), the vice-president of the gang and an inmate at FCF, believed that the victim was an informant in the unrelated prison murder that occurred at FCF. The defense's theory was that Blecha was in the gymnasium when the murder occurred, that the investigation overlooked inmate Ford's information that pointed to other suspects, and that the prosecution's case was based solely on the testimony of "liars, thieves and murderers."

Bates, who lived a few cells away from the victim, testified that on the evening of the murder he saw Younger, Green, and Blecha enter the victim's cell and shut the door. Bates testified that he walked by the victim's cell and saw Younger holding the victim in a headlock, Blecha standing in front of the victim with his hands up in the air, and Green standing behind Blecha holding a cord. Bates went to inmate Heath Pinion's (Pinion) cell and told him "they were doing Danny." Bates returned to the victim's cell and saw Green, Blecha, and Younger putting the victim on the top bunk bed. Bates then informed three additional inmates—Les Simpkins, Perniel Cannon, and Leidal—as to what he saw, and unsuccessfully attempted to rouse the victim by kicking the door to the victim's cell.

Bates further testified that the day after the murder Younger motioned to Bates by raising his index finger to his lips, indicating to Bates to be quiet. Three or four days after this incident, Younger told Bates that "[h]e knew I seen it, and he didn't want me to say anything."

Bates, who had six prior felony convictions, initially denied knowledge of the murder at an interview in July. He later indicated that he would provide information about the murder but only if he were transferred to another facility. Upon obtaining the transfer and after giving information to the authorities, Bates escaped from the new facility. In addition, Bates initially told investigators that the murder occurred before 4:00 p.m., which was physically impossible because the victim was alive at the stand-up count that occurred at the 4:00 lockdown on the day of the murder. The defense introduced evidence from inmates Simpkins and Cannon that contradicted parts of Bates's testimony.

Inmate Kailey, an ex-police officer serving a sentence for aggravated incest and a resident of a cell located near the victim's cell, also testified at trial. Although Kailey denied giving investigators information about the murder, the prosecution introduced prior inconsistent statements made by Kailey to an investigator in November of 1993 in which Kailey stated that he saw approximately ninety percent of the events surrounding the murder, but not the actual killing. These statements established that Kailey heard Blecha ask the inmates of the cell next to Kailey whether they had any cable. Kailey saw another inmate take the victim's cellmate to the library, and then saw Blecha, Green, and Younger walk into the victim's

cell with Blecha holding a television cable in his hand. Kailey believed that the victim "ratted" on some of the parties responsible for a murder at FCF. Between 6:15 p.m. and 6:30 p.m., Kailey heard a commotion coming from the victim's cell and heard Younger yelling obscenities.

Inmate David Snyder (Snyder) testified to his conversations with Blecha occurring in October and November of 1992. Snyder testified that according to Blecha, Green asked Blecha to kill the victim because Green believed that the victim was an informant in the murder at FCF. Blecha told Snyder that Younger was brought in to help. Blecha also informed Snyder that Green was the lookout and Younger held the victim down while he, Blecha, strangled the victim with a cable cord. Blecha said that he revived the victim, who had lost consciousness, in an attempt to make him admit that he was an informant. The victim denied giving any information, and then Blecha strangled him.

On cross-examination, Snyder admitted to approximately twenty felony convictions for crimes of violence and a desire to be transferred to a facility in the State of Washington where his wife lives. The defense further impeached Snyder by calling Ron Scherich (Scherich), who testified that Snyder said one way to obtain a transfer to an out-of-state prison was to become a "snitch" to a murder case. According to Scherich, Snyder said that one could learn the details of the crime from rumors circulating in prison, reading newspaper accounts of the prison murder, and reading court documents provided to inmate defendants. Scherich testified that he himself knew the facts of this murder and had read court documents relevant to the case.

Inmate Richard Lofton (Lofton) also testified at the trial. During his testimony, he denied telling investigators that Blecha admitted to him that he killed the victim. Lofton also denied telling investigators that he sent a letter to Schneider at FCF inquiring whether the victim was a snitch. Lofton testified that he received a letter from another inmate, not Schneider, saying that the victim was not a snitch, and that he showed this letter to both Green and Blecha two days before the murder.

The prosecution then introduced prior inconsistent statements made by Lofton to the chief investigator in August of 1993. Lofton told the chief investigator that he thought Blecha and Green wanted to kill the victim because of the rumor that the victim was a snitch. Lofton also told the investigator that before the murder Blecha told him that Blecha, Green, and Younger were "going to do" the victim, and Blecha asked Lofton if he "wanted to ride with them in this." Lofton said that he declined, suggesting that they just beat up the victim. Blecha responded by saying, "No, he ratted on a righteous white dude." Lofton informed the investigator that just prior to the murder, Blecha came to Lofton's cell asking for gloves. Lofton did not give him any gloves but asked if Blecha was going to do it, and Blecha nodded "yes." Blecha told Lofton that Younger and Green were going to help kill the victim. A day or two after the murder Blecha told Lofton: "We did it." Further, Lofton told the investigator that he wrote Schneider before the killing at FCF asking whether the victim was a snitch and that two days after the murder, Lofton received a reply letter from Schneider saying that another inmate, Randy Schruder (Schruder), not the victim, was the snitch. Lofton said that he showed the letter to Blecha, who laughed, and Green, who turned white. Later, Lofton flushed the letter down the toilet. Lofton said that Younger, who was 6'3" tall and weighed 235 pounds, was "the muscle" in committing the murder. Immediately after the homicide, however, Lofton told investigators that he knew nothing about the murder.

Schruder testified that while incarcerated at FCF, Schneider gave him a letter and ordered him to mail it to Green at LCF. Schruder testified that he read the letter and that it ordered the execution of the victim for his activities as a snitch in the FCF murder. Schruder testified that Green was a member of the Aryan Brotherhood, and described conversations with Green in which Green acknowledged receiving the letter ordering the execution and admitted that he, along with Younger and Blecha, killed the victim. On

cross-examination, Schruder admitted that he participated in the FCF murder and was serving a sentence of thirteen years pursuant to a plea bargain for this killing. Schruder also stated that he faced habitual criminal charges at the time he made his plea bargain, and admitted to lying on prior occasions.

Ford testified that shortly after the murder, he listened through the prison vent system and overheard another inmate talking about the murder and implicating three other inmates. Prison officials expressed conflicting opinions as to Ford's credibility. However, the primary investigative officer disregarded Ford's information, concluding that it was unreliable.

There was conflicting evidence as to when the victim was last seen alive and when Blecha left the pod to go to the gymnasium, where he was located at the time of the 7:00 p.m. lockdown. The prosecution did not mention Younger's statements to Bates during its opening statement or its closing arguments.

The jury found Blecha guilty of first degree murder and conspiracy to commit first degree murder. Blecha appealed to the court of appeals, arguing that the admission of Younger's statements violated CRE 802's prohibition against hearsay and the confrontation clauses of the United States and Colorado Constitutions. The court of appeals held that Younger's statements did not fall within any hearsay exception or hearsay exemption and that their admission into evidence was erroneous. The court of appeals concluded that the erroneous admission of these statements constituted harmless error and held that Blecha's conviction should stand. Blecha then appealed to this court.[3]

## II. CO–CONSPIRATOR HEARSAY

■ Hearsay statements are out-of-court declarations offered into evidence for the truth of the matter asserted. *See* CRE 801(c). Hearsay statements are presumptively unreliable since the declarant is not present to explain the statement in context. Moreover, since the declarant is not subjected to cross-examination, the truthfulness of the statement is questionable. *See* Paul Marcus, *Prosecution and Defense of Criminal Conspiracy Cases* § 5.04[1], at 5–16 (1996). Due to this presumptive unreliability, hearsay statements are generally not admissible as evidence at trial. *See Bourjaily v. United States*, 483 U.S. 171, 179, 107 S.Ct. 2775, 2780–81, 97 L.Ed.2d 144 (1987). However, the out-of-court declarations of criminal conspirators "made during the course of and in furtherance of the conspiracy" are deemed non-hearsay under CRE 801(d)(2)(E) and may be admissible against all of the participants in the conspiracy.

■ The scope of the co-conspirator exception[4] is narrow, *see Krulewitch v. United States*, 336 U.S. 440, 444, 69 S.Ct. 716, 718–19, 93 L.Ed. 790 (1949), and the requirement that the co-conspirator's statement be made during the course of and in furtherance of the conspiracy is a "prerequisite to admissibility" that must be "scrupulously observed." *Id.* The proponent must demonstrate the existence of both of these factors to overcome the presumption of unreliability that is the basis of the prohibition against the admission of hearsay. *See Williams v. People*, 724 P.2d 1279, 1285 (Colo.1986).

CRE 801(d)(2)(E)'s provision for the admission of co-conspirator statements is based on a theory of agency. Each conspirator is considered the agent of the other conspirators when acting or speaking to promote the conspiracy.[5] *See* 5 Jack B. Weinstein &

---

**3.** The issue as framed on certiorari is:

Whether the court of appeals erred by affirming the trial court's admission of out-of-court statements made by co-defendant Robert Younger.

**4.** Technically, the co-conspirator rule is a hearsay exemption that renders co-conspirator statements nonhearsay, however, the rule is commonly referred to as a hearsay exception.

**5.** Another rationale for the co-conspirator exception is that the live testimony of a co-conspirator is not necessarily the "better" version, because "[c]onspirators are likely to speak differently when talking to each other in furtherance of their illegal aims than when testifying on the witness stand" and "it is extremely unlikely that in-court testimony will recapture the evidentiary significance of statements made when the conspiracy was operating in full force." *United*

Margaret A. Berger, *Weinstein's Evidence* § 801.30, at 801–59 (Joseph M. McLaughlin, ed., 2d ed.1998); *United States v. Perez,* 989 F.2d 1574, 1577 (10th Cir.1993). However, just as an agent's responsibilities end upon the termination of the agency relationship, "all such responsibility is at an end when the conspiracy ends." *Fiswick v. United States,* 329 U.S. 211, 217, 67 S.Ct. 224, 227–28, 91 L.Ed. 196 (1946); *see also People v. Armstrong,* 704 P.2d 877, 879 (Colo.App.1985). "There can be no furtherance of a conspiracy that has ended." *Lutwak v. United States,* 344 U.S. 604, 617–18, 73 S.Ct. 481, 489, 97 L.Ed. 593 (1953).

■ Thus, it is well-settled under Colorado and federal law that co-conspirator statements made after the conspirators attain the object of the conspiracy are not admissible under this exception unless the proponent demonstrates "an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." *Grunewald v. United States,* 353 U.S. 391, 404, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957); *see also Villafranca v. People,* 194 Colo. 472, 474, 573 P.2d 540, 542 (1978).[6] The proponent can satisfy this requirement by showing that the objectives of the original conspiracy include such an agreement or that there exists a separate conspiracy to conceal. *See Kolkman v. People,* 89 Colo. 8, 18, 300 P. 575, 579 (1931).

■ It is also well-settled that "secrecy plus overt acts of concealment" do not establish an express agreement to act in concert in order to conceal the crime. *Grunewald,* 353 U.S. at 403, 77 S.Ct. at 973. Acts of concealment occur in every conspiracy case, *see id.* at 404, 77 S.Ct. at 973–74, and admission of hearsay statements on this basis would impermissibly expand the narrow scope of the co-conspirator exception and further dilute

the general prohibition against hearsay statements. *See Krulewitch,* 336 U.S. at 444, 69 S.Ct. at 718–19 (holding that statements aimed at preventing detection and punishment were not admissible under the co-conspirator exception). As the United States Supreme Court articulated in *Grunewald v. United States:*

> [A] subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.... Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators.... [E]very conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the Government's theory would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators.

*Grunewald,* 353 U.S. at 401–02, 77 S.Ct. at 972.

We adopted this view in *Villafranca v. People,* when we stated:

> Not every conspiracy continues beyond the time of the occurrence of the crime that is the object of the conspiracy. There must be some specific evidence of a plan or agreement of concealment to demonstrate the pendency of the conspiracy at the time that the statements were made.

*Villafranca,* 194 Colo. at 474, 573 P.2d at 542.[7]

■ Applying these principles to the facts of this case, the prosecution sought the admission of two hearsay statements made by

States v. Inadi, 475 U.S. 387, 395, 106 S.Ct. 1121, 1126, 89 L.Ed.2d 390 (1986).

6. Among the numerous other cases articulating this principle are *Lutwak,* 344 U.S. at 616–18, 73 S.Ct. at 488–90; *Krulewitch,* 336 U.S. at 442–44, 69 S.Ct. at 717–19; *Fiswick,* 329 U.S. at 217, 67 S.Ct. at 227–28; and *People v. Orr,* 39 Colo.App. 289, 295, 566 P.2d 1361, 1366 (1977).

7. Other opinions of this court consistent with *Villafranca* include *Bingham v. People,* 157 Colo. 92, 98, 401 P.2d 255, 258 (1965); *Reed v. People,* 156 Colo. 450, 456, 402 P.2d 68, 71 (1965); and *Kolkman,* 89 Colo. at 17, 300 P. at 578. *Cf. Smaldone v. People,* 103 Colo. 498, 510, 88 P.2d 103, 110 (1938) (dicta).

Younger after the commission of the murder. Such statements are admissible only if the prosecution demonstrates the existence of an express agreement among the conspirators to continue to act in concert in order to conceal the crime.

The record shows that the conspirators disposed of the murder weapon and placed the victim's body in a manner that would give the appearance that the victim was asleep. "[A]cts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." *Grunewald*, 353 U.S. at 402, 77 S.Ct. at 973 (holding that conspirators' efforts to conceal irregularities in documents and attempts to silence witnesses were insufficient evidence of an explicit agreement to conceal the crime). The record also shows that in the days following the murder, Younger made two statements to Bates that could be construed as an attempt to silence Bates. While these statements may demonstrate Younger's purpose to conceal the murder conspiracy, they are not evidence that the murder conspiracy included the further agreement to conceal. *See Lutwak*, 344 U.S. at 616, 73 S.Ct. at 488 (explaining that statements "in the nature of an afterthought by the conspirator for the purpose of covering up" do not constitute evidence of an agreement to conceal). Other conspirators did not similarly attempt to silence witnesses. Review of the record discloses no evidence that concealment was an explicit objective of the murder conspiracy and no evidence of a separate conspiracy with the explicit objective of concealing the murder. Hence, we hold that Younger's statements were not admissible under the co-conspirator exception because they were not made during the course of and in furtherance of the conspiracy to murder as required by CRE 801(d)(2)(E), and we affirm the court of appeals' ruling that the district court's admission of these statements was error.

8. Although the prosecution did not raise this exception at trial, a party may defend the judgment of the district court on any ground supported by the record even if the district court did

## III. STATEMENT AGAINST INTEREST

■ Next, we turn to the prosecution's argument that the statements were admissible as statements against interest.[8] A statement against interest is an exception to the prohibition against hearsay. CRE 804(b)(3) provides that an out-of-court statement by a declarant who is "unavailable" to testify as a witness at trial may be admitted if it is

[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.

### A.

■ As a threshold matter, we address the prosecution's argument that Blecha was required, but failed, to preserve his objection on the admissibility of the hearsay statements as statements against interest. At Blecha's trial, the defense attorney objected to the admission of Younger's statement as follows:

DEFENSE ATTORNEY: Judge, if counsel could approach at this point?

(Out of hearing of the jury.)

DEFENSE ATTORNEY: We're going to start getting into some hearsay statements, and I'm going to have an objection based on that. If the prosecution's theory is that this is still part of the conspiracy, the murder is already over, the act is already completed, there's nothing being done in furtherance of the conspiracy in terms of this case.

PROSECUTOR: I ... think the conspiracy still is continuing because there is an effort to cover up the event and this conversation is directly involved with trying to cover up something about the event.

. . . .

not consider or rely on the argument. *See People v. Quintana*, 882 P.2d 1366, 1373 n. 11 (Colo. 1994).

THE COURT: ... I'll give you a continuing objection to any statements that may be made by Roger Younger at this time.

DEFENSE ATTORNEY: That's fine.

THE COURT: And that would be in the record and preserved for appeal.

DEFENSE ATTORNEY: Okay. Thank you.

▮▮ The prosecution argues that Blecha never raised the issue of Younger's unavailability at trial and that the availability issue was not properly preserved for appellate review. Although the defense attorney did not make a contemporaneous argument against the applicability of the statement against interest exception to hearsay in this case, he was under no obligation to do so. All the attorney must say at the time a witness utters a questionable statement is: "Objection, hearsay." This objection preserves the issue for appeal. Further argument by the attorney may be appropriate if the proponent expresses reliance on a particular hearsay exception. It is neither appropriate nor necessary for the attorney making the objection to identify and describe every hearsay exception and to argue against their applicability. Such a tedious procedure for a hearsay objection would constitute an enormous waste of judicial resources and would reduce the efficient operation of jury trials. If we were to adopt the prosecution's argument, an attorney would be forced to anticipate each hearsay exception that an opponent might later argue on appeal. In addition, the prosecution's argument conflicts with the established rule that "[t]he prosecution, as the proponent of the ... hearsay statements, ha[s] the burden to establish the foundation for admitting the statements under an exception to the hearsay rule." *Oldsen v. People*, 732 P.2d 1132, 1137 n. 7 (Colo.1986). In this case, the prosecution had the burden of demonstrating that the hearsay exception applies by establishing that Younger was unavailable. Since the prosecution did not meet its burden, we conclude that Blecha did not waive his right to contest the admissibility of Younger's hearsay as statements against interest.

B.

▮▮ The statement against interest exception to the hearsay rule applies only when the declarant is unavailable to testify as a witness. *See* CRE 804(b)(3); *Williams*, 724 P.2d at 1282 n. 5. The district court did not address the statement against interest exception in its pre-trial ruling, having determined that the statements were admissible under the co-conspirator exception. The district court did find, in a separate discussion concerning the Confrontation Clause, that Younger was not available to testify at trial since at the time of the pre-trial hearing, Younger was facing murder and conspiracy charges and therefore enjoyed the protection afforded by the Fifth Amendment privilege against self-incrimination.

The critical issue in determining Younger's availability was whether Younger was available to testify as a witness at the time of trial. After the hearing but before Blecha's case proceeded to trial, Younger's acquittal stripped him of his Fifth Amendment protection. *See* 1 *McCormick on Evidence* § 121, 439 (John William Strong, ed., 4th ed. 1992) ("If the risk of criminal liability is removed there is no privilege."). Thus, when the prosecution sought to admit Younger's statements at Blecha's trial, Younger was available to testify as a witness, and the statement against interest exception to the hearsay rule did not apply.

The district court's ruling that Younger was unavailable at the time of the pre-trial hearing was correct. The determinative inquiry, however, is not the availability of the witness at the time of the pre-trial hearing, but the availability of the witness at the time of trial. When the defense renewed its objection to the admission of these statements at trial, the prosecution failed to meet its burden under CRE 804(b)(3) to show that Younger, who no longer enjoyed the privilege against self-incrimination, was not available to testify. Thus, we hold that the district court's admission of these statements cannot be justified as the admission of statements against interest.

## IV. CONFRONTATION CLAUSE

■ Having determined that Younger's hearsay statements are neither co-conspirator statements against interest, we turn to Blecha's argument that the district court's admission of Younger's hearsay statements violated his right to confrontation under the United States and Colorado Constitutions.[9] In *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980), the United States Supreme Court stated that in the usual case, a federal confrontation clause analysis involves the application of a two-part test. Under the first prong of the test, the "prosecution must either procure, or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant." *Id.* at 65, 100 S.Ct. at 2538. After the prosecution proves unavailability, if the hearsay statement does not fall within a firmly rooted hearsay exception the prosecution must demonstrate that the statement possesses "particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. at 2539. In an effort to maintain consistency between Colorado law and federal law, we adopted this test in *People v. Dement,* 661 P.2d 675, 681 (1983), to determine whether the admission of hearsay violated a defendant's right of confrontation secured by Article II, Section 16 of the Colorado Constitution.

˙ After its decision in *Ohio v. Roberts,* the United States Supreme Court substantially limited the two-step federal constitutional analysis. *See United States v. Inadi,* 475 U.S. 387, 394–400, 106 S.Ct. 1121, 1125–28, 89 L.Ed.2d 390 (1986); *Idaho v. Wright,* 497 U.S. 805, 815, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990).[10] In our opinions we continued to apply the two-step test in an effort to follow federal constitutional law. *See People v. Fuller,* 788 P.2d 741, 748 (Colo. 1990); *People v. Drake,* 785 P.2d 1253, 1255 (1989); *People v. Diefenderfer,* 784 P.2d 741, 747 (Colo.1989). We have never expressly

disavowed the two-part test required by *People v. Dement* under the Colorado Constitution. In this case, both parties assumed the continued vitality of the two-part test. Neither party addressed the issue of whether we should revisit *Dement* in light of the more recent United States Supreme Court cases severely limiting the two-part test. Thus, we apply this test in this case but emphasize that in so doing we reach no decision on whether the two-part test articulated in *Dement* retains its vitality in light of Supreme Court decisions and wait for another case to decide this issue.

Here, the first prong of the *Dement* test is dispositive of whether Younger's hearsay was admissible. As discussed in section III, the prosecution failed to establish that Younger was unavailable for trial. At the time of trial, he was no longer protected by the privilege against self-incrimination and he was available to the prosecution to be called as a witness and to be subjected to cross-examination. The first part of the confrontation clause test is not met, thus, the admission of Younger's hearsay statements is constitutional error.

Younger's hearsay statements fail to meet the first prong of the confrontation clause analysis under the Colorado Constitution. Thus, we neither address the second prong of this test nor do we conduct a Confrontation Clause analysis under the federal constitution. We hold that the district court's admission of Younger's hearsay statements constituted constitutional error.

## V. HARMLESS ERROR

■ Having concluded that constitutional error occurred in this case, we turn to the prosecution's assertion that this error was harmless.

---

**9.** "The Confrontation Clause ... bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

**10.** Under *Inadi,* when the proponent seeks to admit hearsay statements that were made during circumstances other than prior testimony, the

proponent only needs to satisfy the second prong of *Roberts* by demonstrating that the statement falls within a firmly rooted hearsay exception or that the statement possesses "particularized guarantees of trustworthiness." *Inadi,* 475 U.S. 387, 394–400, 106 S.Ct. 1121, 1125–29, 89 L.Ed.2d 390.

Constitutional errors fall within one of two classes. The first type of error, "structural error," is a "structural defect[ ] affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," and requires automatic reversal. *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991); *see also Bogdanov v. People,* 941 P.2d 247, 252 (Colo.1997). The second type of error, known as "trial error," occurs "during the presentation of the case to the jury and ... may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante,* 499 U.S. at 307–08, 111 S.Ct. at 1264; *see also Chapman v. California,* 386 U.S. 18, 21–22, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1967). Violations of a criminal defendant's right of confrontation are trial errors. *See Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728–29, 23 L.Ed.2d 284 (1969); *Vega v. People,* 893 P.2d 107, 120 (Colo.1995).

The error here was a trial error that requires reversal "unless the appellate court can 'declare a belief that the error was harmless beyond a reasonable doubt.'" *Key v. People,* 865 P.2d 822, 827 (Colo.1994) (quoting *Leonardo v. People,* 728 P.2d 1252, 1257 (Colo.1986) (alterations omitted)). The prosecution bears the burden of proving that Younger's hearsay statement did not contribute to Blecha's conviction or that the "error was harmless beyond a reasonable doubt." *Id.* On the other hand, if there is a reasonable probability that Blecha could have been prejudiced by the error, the error cannot be harmless. *See id.; Chapman,* 386 U.S. at 23–24, 87 S.Ct. at 827–828.

Our discussion in *Merritt v. People,* 842 P.2d 162 (Colo.1992), supplies guidance and structure to analyze whether the denial of the right to confrontation constituted harmless error in this case:

The inquiry here is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. An appellate court should examine a num-ber of factors, including the importance of the witness' testimony to the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence on the material points of the witness' testimony, the extent of the cross-examination otherwise permitted, and the overall strength of the prosecution's case.

*Id.* at 169.

*Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), represents the most recent articulation by the United States Supreme Court of the harmless error standard. There, the Court in a unanimous opinion stated that a reviewing court must consider "not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Id.* at 279, 113 S.Ct. at 2081. The Court further stated:

Harmless-error review looks, we have said, to the basis on which "the jury actually rested its verdict." The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.

*Id.* (quoting *Yates v. Evatt,* 500 U.S. 391, 404, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991)).

When engaging in a fact-specific quantification of the evidence, an appellate court must abide by certain limitations. An appellate court may not sit as the thirteenth juror and engage in credibility determinations. *See People v. Medina,* 185 Colo. 183, 185, 522 P.2d 1233, 1234 (1974). The reviewing court must reach conclusions from an analysis of the cold record that reveals little about important impressions and emotional influences that witnesses have on juries. In assessing evidence of guilt, the appellate court does not have the benefit of the actual presentation of testimony—witnesses' demeanor, phrasing, hand or facial gestures and the like—that often forms persuasive reasons to accept or to reject key points of a witness's testimony. *See* Harry T. Edwards, *To Err is Human, But Not Always Harm-*

*less: When Should Legal Error Be Tolerated?* 70 N.Y.U. L.Rev. 1167, 1193–94 n. 110 (citing Roger J. Traynor, *The Riddle of Harmless Error* 20–21 (1970)).[11] There can be little argument that meaningful and significant trial events bypass the official trial transcript.

Applying the *Sullivan v. Louisiana* test the question we address is whether a careful review of the record establishes that the admission of Younger's hearsay statements was harmless beyond a reasonable doubt to this jury. To guide our analysis, we examine the relevant factors discussed in *Merritt:* the importance of Younger's hearsay statements to the prosecution's case, the overall strength of the prosecution's case, whether the probative value of the statements was cumulative, and the presence or absence of corroborating or contradictory evidence on the facts asserted in the statements.

In considering the importance of Younger's hearsay statements to the prosecution's case, we note that the prosecutor had an opportunity to address the jury directly on three occasions: opening statement, closing argument, and rebuttal. On none of these occasions did the prosecutor argue the Younger hearsay, suggesting that the inadmissible statements were of minimal importance to the prosecution's case.

The prosecution's case, presented over six days, consisted of corroborating Bates's eyewitness account of the murder—that Younger, Blecha, and Green killed the victim. The bulk of this corroboration consisted of inmate testimony. The consistency of the details of the admissions by Blecha to Snyder and Lofton, and by Green to Schruder and Lofton, identifying the killers as Blecha, Green, and Younger, and providing the details of the offense, such as the use of gloves, the use of a cable to strangle the victim, in combination with Bates's testimony and the known physical evidence of the killing (Green's palm print, ligature strangulation as the cause of death, discovery of the discarded coaxial cable and piece of silver wire found in the victim's bedding) provide powerful evidence corroborating Bates's account. Lofton said that Younger was "the muscle," and independent evidence established that Younger was big and strong—six foot, three inches tall and 235 pounds. Also, Schruder, a confessed killer in the unrelated FCF murder, provided the details of being ordered to mail a letter to Green at LCF ordering the victim's death because the victim was a snitch. Lofton testified that he discovered after the victim's death that the killing was based on mistaken information and that the person who ordered the murder, Schneider, now believed that the victim was not an informant. Further crediting Bates's testimony are Kailey's statements that he heard Blecha ask other inmates for the cable, saw Blecha walk into the victim's cell holding a cable in his hand, saw Green and Younger enter the cell just before the commotion, heard Younger yell obscenities, saw Green standing inside the victim's cell with the door closed acting as a lookout, and saw the victim lying on the top bunk after the three left the cell. Based on this evidence, we conclude that the prosecution's case was strong.

We now address the probative value [12] of Younger's hearsay statements that he knew Bates saw "it" and that he wanted Bates to

---

**11.** "To err is human, as a judge well knows, but to err is not always harmless." Traynor, *supra,* at 3. Justice Traynor cautioned against the dangers of "a quasi trial on appeal" as follows:

> The appellate court is limited to the mute record made below. Many factors may affect the probative value of testimony, such as age, ... intelligence, experience, occupation, demeanor, or temperament of the witness. A trial court or jury before whom witnesses appear is at least in a position to take note of such factors. An appellate court has no way of doing so. It cannot know whether a witness answered some questions forthrightly but evaded others. It may find an answer convincing and truthful in written form that may have sounded unreliable at the time it was given. A well-phrased sentence in the record may have seemed rehearsed at the trial. A clumsy sentence in the record may not convey the ring of truth that attended it when the witness groped his way to its articulation. What clues are there in the cold print to indicate where the truth lies? What clues are there to indicate where the half-truth lies?

*Id.* at 20–21.

**12.** The "probative value" of evidence is its tendency to establish the proposition that it is offered to prove. *See McCormick, supra,* § 185, at 774.

keep quiet. These statements contain the following arguable[13] assertions of fact: Younger was threatening Bates because Younger knew Bates was an eyewitness since Younger saw Bates looking in the victim's cell during the murder.

The fact that Younger threatened Bates was attested to by a separate reliable source. The chief investigating officer testified that Younger threatened Bates's life and that Bates was in fear of his life from the day of the murder until he was transferred from LCF. Thus, this aspect of Younger's hearsay was corroborated by stronger and more reliable evidence than the inadmissible evidence and did not impact the jury verdict. *Cf. Vega*, 893 P.2d at 120; *Merritt*, 842 P.2d at 169.

Our final consideration is the second factual assertion implicit in the hearsay statements, that Bates was an eyewitness to the murder and that Younger arguably admitted his guilt when he said he knew Bates "seen it." Blecha contends that these statements bolstered Bates's credibility and thereby contributed to his conviction. However, Bates's testimony describing the prison murder possesses substantial accuracy due to the combined effect of the interlocking admissions made by Blecha and Green to other inmates at different times and places, the observations of Kailey, and the factual consistencies of Bates's and Kailey's eyewitness accounts when compared to these admissions and the known physical evidence of the crime. What Bates says he saw is convincingly corroborated by all of the evidence. When viewed in this evidentiary context, Younger's hearsay statements do not contribute to the jury's conclusion that Bates's eyewitness account was reliable.

Considering the evidence independent of Younger's hearsay statements linking Younger to the crime, the persuasive corroborative evidence substantiating Bates's account of the murder, and the lack of importance of Younger's hearsay statements to the prosecution's case, the impact these inadmissible statements had on the jury was insignificant. This error appears to be "so unimportant and insignificant," *Chapman*, 386 U.S. at 22, 87 S.Ct. at 827, that it is to be deemed harmless since the erroneous admission of Younger's hearsay statements surely did not contribute to Blecha's guilty verdict. This record fails to establish a reasonable probability that Blecha could have been prejudiced by the erroneous admission of Younger's hearsay statements. Thus, we hold that the constitutional error in admitting the Younger hearsay statements was harmless beyond a reasonable doubt.

## VI.

For the reasons stated, we affirm the court of appeals' decision affirming Blecha's conviction.

---

**13.** We use the term "arguable" to describe the factual assertions contained in Younger's hearsay statements since the statements are susceptible to other interpretations that do not necessarily imply Younger's guilt. When Younger saw Bates looking into the victim's cell, Younger may have been in another location in the pod and not within the victim's cell while the murder was occurring. Alternatively, Younger may have learned through the prison grapevine that Bates said he was an eyewitness to the murder. Under either alternative factual theory, Younger's statement does not constitute an admission of his involvement in the murder.