22CA1586 Peo v Thompson 11-20-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1586
Arapahoe County District Court No. 20CR2860
Honorable Shay K. Whitaker, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Romeo Desean Thompson,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE KUHN
J. Jones and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 20, 2025

---

Philip J. Weiser, Attorney General, Allison S. Block, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Taylor J. Hoy, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Romeo Desean Thompson, appeals his conviction for second degree murder.  We reverse and remand for a new trial.

I.     Background

¶ 2     We draw the following factual background from the record, evidence, and testimony presented at trial.  In November 2020, the victim, P.H., and his wife, D.H., were driving and came to a stop at an intersection.  Thompson; his girlfriend, I.H.; and I.H.'s two children were in the car behind them.  Thompson was driving.  After the light turned green and P.H.'s car did not move, Thompson honked his horn.  P.H. then drove forward and stopped suddenly to brake check Thompson.  Thompson braked to avoid hitting P.H.'s car, pulled up next to P.H. and D.H., and threw a full plastic drink bottle at their car.  The bottle hit their car door, and Thompson sped off.

¶ 3     P.H. then began following Thompson and pursued his vehicle for approximately four miles.  During the pursuit, I.H. noticed that D.H. was on the phone and believed that she was recording their car or had called the police.  The pursuit eventually concluded in a residential neighborhood, where Thompson stopped his car on the side of the road.  P.H., following close behind, pulled in front of

Thompson's car and parked. After getting out of their respective cars, P.H. walked around the rear of his car and approached Thompson. The two exchanged insults, and, according to I.H., P.H. pushed Thompson against the backseat window of his vehicle.

¶ 4     From there, a brief physical altercation ensued between P.H. on one side and Thompson and I.H. on the other. P.H. and Thompson rolled onto the ground. There, Thompson pulled a firearm from his waistband and shot P.H. three times.[1] Thompson and I.H. then returned to their car and left the scene. P.H. was transported to the hospital but died from his wounds.

¶ 5     Thompson was charged with first degree murder and possession of a weapon by a previous offender (POWPO).[2] After the trial court granted his motion to bifurcate the counts, Thompson went to trial on the first degree murder charge. The jury found him guilty of the lesser included offense of second degree murder. The

---

[1] A total of four shell casings were found at the scene, but the exact number of rounds Thompson fired is not relevant to this appeal.

[2] Thompson eventually pleaded guilty to the POWPO charge, receiving three years in Department of Corrections' custody to be served concurrently with the sentence on his second degree murder conviction.

2

court sentenced him to thirty years in the Department of Corrections.

## II.    Analysis

¶ 6        Thompson contends that the trial court reversibly erred by (1) instructing the jury on the initial aggressor exception to self-defense; (2) failing to prevent prosecutorial misconduct; and (3) disallowing one of his attorneys from objecting during the prosecution's closing argument.  We agree on the first point and need not reach the remaining contentions.

### A.    Initial Aggressor Instruction

¶ 7        Thompson contends that the trial court reversibly erred by instructing the jury on the initial aggressor exception to self-defense.  We agree.

#### 1.    Additional Background

¶ 8        Thompson endorsed the affirmative defense of self-defense.  As a result, both parties tendered self-defense jury instructions reciting the elements of the affirmative defense and the prosecution's accompanying burden.  However, the prosecution included the provocation and initial aggressor exceptions to

3

self-defense in its proposed instruction, while Thompson's counsel did not.

¶ 9     On the fourth day of trial, the trial court convened a jury instruction conference, during which it heard arguments from both sides regarding the inclusion of initial aggressor and provocation jury instructions.[3]  The prosecutor based his argument in favor of the initial aggressor instruction on three pieces of evidence: the honk, the bottle throw, and Thompson getting out of his car before P.H.  In the prosecutor's view, these three acts constituted "some evidence of [Thompson] being the initial aggressor in this case."  Thompson's counsel disagreed, arguing that the honking and bottle throwing occurred ten to twenty minutes before the physical confrontation, when P.H. initially slammed Thompson against his vehicle.

¶ 10    Thompson's counsel argued that the thrown bottle may have been rude, but it was not an imminent use of unlawful physical force against P.H.  And she further observed that the two men got out of their cars "very close in time to one another."  She asserted

_____

[3] The trial court ultimately excluded the provocation exception instruction.

that this undercut the prosecutor's argument that Thompson — as the first one out of a car — was the aggressor. Thompson's attorney argued, therefore, that an initial aggressor instruction was inappropriate and unsupported by the evidence.

¶ 11 The trial court grappled with this issue on the record, and it indicated several times that the evidence presented might not support the instruction. Discussing *Castillo v. People*, 2018 CO 62, the court repeatedly expressed concerns that none of Thompson's actions amounted to a threat of imminent unlawful physical force, as required to support an initial aggressor instruction. The prosecutor explained that, in his view, by throwing an object at another vehicle in traffic, Thompson engaged in actual unlawful physical force that went "beyond the pale of conduct that reasonable people expect . . . during . . . traffic disputes." Still, the trial court remained unconvinced, saying, "Even throwing the bottle at the vehicle, I don't know that we get to a place where there is any evidence that, then, there was a threatened use of unlawful physical force . . . ."

¶ 12 Despite its concerns, the trial court decided to include the initial aggressor instruction, reasoning "that there [wa]s some

evidence . . . about who gets out of the car first[] [and] who [wa]s approaching who first," which could implicate questions of fact for the jury to determine. The final instruction that went to the jury read as follows:

### Jury Instruction No. 13

The evidence presented in this case has raised the affirmative defense of "deadly physical force in defense of person," as a defense to Murder in the First Degree. Mr. Thompson was legally authorized to use deadly physical force upon another person without first retreating if:

1. he used that deadly physical force in order to defend himself from what he reasonably believed to be the use or imminent use of unlawful physical force by that other person, and

2. he reasonably believed a lesser degree of force was inadequate, and

3. he had a reasonable ground to believe, and did believe, that he was in imminent danger of being killed or of receiving great bodily injury, and

4. he was not the initial aggressor, or, if he was the initial aggressor, he had withdrawn from the encounter and effectively communicated to the other person his intent to do so, and the other person nevertheless continued or threatened the use of unlawful physical force.

6

### 2. Applicable Law and Standard of Review

¶ 13    By raising an affirmative defense, the defendant "essentially admits the commission of the elements of the charged offense but seeks to justify, excuse, or mitigate [the] conduct." *Galvan v. People*, 2020 CO 82, ¶ 21. If the presented evidence properly "raises the issue of an affirmative defense, the affirmative defense effectively becomes an additional element, and the trial court must instruct the jury that the prosecution bears the burden of proving beyond a reasonable doubt that the affirmative defense is inapplicable." *People v. Pickering*, 276 P.3d 553, 555 (Colo. 2011).

¶ 14    Colorado's affirmative defense of self-defense is codified in section 18-1-704, C.R.S. 2025. As pertinent here, a person may use deadly physical force only if (1) the "person reasonably believes a lesser degree of force is inadequate"; and (2) the person "has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury." § 18-1-704(2)(a).

¶ 15    The prosecution can overcome the affirmative defense by disproving either of the two above-listed requirements. *See Galvan*, ¶ 22. Alternatively, the prosecution could "prove beyond a

reasonable doubt that an exception to self-defense applies." *Id.*
(quoting *Castillo*, ¶ 40). As relevant here, the jury was instructed
on the initial aggressor exception. That exception provides that a
person is not justified in using physical force if the person "is the
initial aggressor," unless the person "withdraws from the encounter
and effectively communicates to the other person [their] intent to do
so, but the latter nevertheless continues or threatens the use of
unlawful physical force." § 18-1-704(3)(b).

¶ 16    It is the trial court's duty to "instruct the jury on all matters of
law for which there is sufficient evidence to support giving
instructions." *Castillo,* ¶ 34. But this duty does not extend to
abstract legal principles that bear no relation to the issues in
controversy, nor does it permit instructions predicated upon
"fanciful interpretations of the facts unsupported by the record." *Id.*
(quoting *People v. Alexander*, 663 P.2d 1024, 1032 (Colo. 1983)).

¶ 17    "An initial aggressor instruction is warranted when the
evidence suggests the defendant initiated the physical conflict by
using or threatening imminent use of unlawful physical force."
*People v. Roberts-Bicking*, 2021 COA 12, ¶ 33. But engaging in the
conduct giving rise to the charged offense cannot form the basis of

8

an initial aggressor instruction. *See People v. Manzanares*, 942 P.2d 1235, 1241 (Colo. App. 1996) (explaining that defendant firing his pistol could not show he was the initial aggressor because that "would be no more than a rejection of the claim of self-defense"), *abrogated on other grounds by, Riley v. People*, 266 P.3d 1089 (Colo. 2011). And mere insults, without more, are insufficient to transform a defendant into an initial aggressor. *Castillo*, ¶ 44.

¶ 18    When a trial court instructs a jury on self-defense, it "should [also] instruct the jury on the [initial aggressor] exception . . . to that defense if the exception is supported by some evidence." *Galvan*, ¶ 25 (explaining that the exceptions to self-defense are governed by the same quantum of proof as the defense itself); *see also* § 18-1-407(1), C.R.S. 2025 ("[T]he defendant, to raise the [affirmative defense], shall present some credible evidence on that [affirmative defense]."). This quantum of proof is exceedingly low.[4] *People v. Gallegos*, 2023 COA 47, ¶ 47, *aff'd*, 2025 CO 41M.

---

[4] In the context of affirmative defenses, the terms "some evidence," "some credible evidence," "a scintilla of evidence," "any evidence," a "small quantum of evidence," and "any credible [even if highly improbable] evidence" are all synonymous. *Galvan v. People*, 2020 CO 82, ¶ 24 (citations omitted).

Accordingly, a court should decline to instruct on an affirmative defense or an accompanying exception only when there is no evidence in the record to support it. *Id.*

¶ 19     "Whether sufficient evidence exists to support the requested instruction is a question of law that we review de novo." *Castillo,* ¶ 32.

### 3.     No Evidence Supported Giving the Instruction

¶ 20     The People contend that Thompson's collective actions — specifically, honking his horn, throwing a bottle, and getting out of his car slightly before P.H. — constituted sufficient evidence to support the initial aggressor exception instruction. We disagree.

¶ 21     First, the parties agree — as do we — that honking a horn in traffic is analogous to a verbal insult, which, without more, does not create initial aggressor status. *See Castillo,* ¶ 44 ("[I]nsults alone do not make someone an initial aggressor.").

¶ 22     Second, under the specific circumstances of this case, Thompson throwing the bottle at P.H. and D.H.'s vehicle did not support an initial aggressor instruction based on the later altercation. To become the initial aggressor, "[a] defendant must *initiate the physical conflict.*" *People v. Roadcap,* 78 P.3d 1108,

10

1113 (Colo. App. 2003) (emphasis added).  Further, "Colorado case law establishes that an 'initial aggressor' is a person who 'initiated the physical conflict by using or threatening the imminent use of unlawful physical force.'" *People v. Whiteaker*, 2022 COA 84, ¶ 42 (quoting *People v. Griffin*, 224 P.3d 292, 300 (Colo. App. 2009)), *rev'd on other grounds*, 2024 CO 25.  As the trial court noted, the bottle throw does not meet this standard.  To be sure, the bottle throw was, as Thompson argues, rude, and it may have been an attempt to provoke P.H. and D.H. or damage their vehicle.  But it did not threaten their persons or initiate the physical conflict between Thompson and I.H. and P.H.

¶ 23     Instead, the evidence shows that the physical conflict occurred ten to twenty minutes later when P.H. — after chasing Thompson for four miles — got out of his car; approached Thompson; and, according to I.H.'s testimony and the video footage, pushed Thompson up against his car.  This evidence demonstrates that if anyone was the initial aggressor in this conflict it was P.H., not Thompson, because P.H. escalated the situation from insults and provocation when he initiated the actual physical conflict.  *See id.* (determining that the initial aggressor is the person who initiates

11

"the physical conflict by using or threatening the imminent use of unlawful physical force" (quoting *Griffin*, 224 P.3d at 300)).

¶ 24    Finally, the video evidence contradicts the prosecutor's claim that Thompson initiated the physical conflict by getting out of his car. The video, taken from the doorbell camera of a nearby home, shows the two men exiting their vehicles almost simultaneously.[5] And contrary to the trial court's determination, the video clearly shows that P.H. swiftly approached Thompson. Likewise, the only eyewitness testified that P.H. shoved Thompson into the car.[6] The evidence at the hearing was not in conflict; instead, it was solely in Thompson's favor on this point.

¶ 25    Because the prosecution failed to introduce any evidence to support the initial aggressor instruction, we conclude that the trial court erred by giving the instruction to the jury. We now turn to whether this error warrants reversal.

---

[5] Although grainy and low resolution, the video is clear enough to glean the limited information discussed here.

[6] As Thompson's counsel aptly observed at the jury instruction conference, the trial court was able to review this video before making its determination.

### 4. Constitutional Harmless Error Applies

¶ 26    The parties disagree on the applicable standard of reversal. Thompson argues for constitutional harmless error, while the People assert that nonconstitutional harmless error applies. We agree with Thompson.

¶ 27    Constitutional harmless error applies to "trial errors of constitutional dimension that were preserved by objection." *Hagos v. People*, 2012 CO 63, ¶ 11. Thompson's counsel properly preserved this issue for appeal by tendering his proposed self-defense instruction, which did not include the initial aggressor exception, and by objecting to the court giving the initial aggressor instruction. *See People v. DeGreat*, 2015 COA 101, ¶ 10 ("Tendering the desired instruction sufficiently preserved this claim."), *aff'd on other grounds*, 2018 CO 83.

¶ 28    As stated above, an affirmative defense "effectively becomes an additional element" of the charged crime. *Pickering*, 276 P.3d at 555. And "when a trial court misinstructs the jury on an element of an offense, either by omitting or misdescribing that element, that error is subject to constitutional harmless or plain error analysis." *Griego v. People*, 19 P.3d 1, 8 (Colo. 2001); *see also People v.*

13

*Ridgeway*, 2013 COA 17, ¶ 9 ("Where a defendant properly preserves an objection to an elemental jury instruction, the instruction is subject to constitutional harmless error analysis."); *Pearson v. People*, 2022 CO 4, ¶ 16 (determining that an instructional error that lowers the prosecution's burden of proof is subject to constitutional harmless error review).

¶ 29 Here, the trial court misinstructed the jury on Thompson's affirmative defense by including the initial aggressor exception. And because the affirmative defense is treated as an additional element of the charged crime, the improper instruction effectively misdescribed that element of the offense, lowering the prosecution's burden of proof. Thus, we review for constitutional harmless error. *See Griego*, 19 P.3d at 8.

### 5. The Error Was Not Harmless Beyond a Reasonable Doubt

¶ 30 A constitutional error requires reversal unless we can "declare a belief that [the error] was harmless beyond a reasonable doubt." *Hagos*, ¶ 11 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Put differently, "we reverse, if 'there is a reasonable *possibility* that the [error] might have contributed to the

14

conviction.'" *Id.* (quoting *Chapman*, 386 U.S. at 24). The People bear the burden of proving the error harmless beyond a reasonable doubt. *Id.*

¶ 31 Here, the jury instructions accurately conveyed that "[t]he prosecution ha[d] the burden to prove, beyond a reasonable doubt, that [Thompson's] conduct was not legally authorized by this defense. In order to meet this burden of proof, the prosecution must disprove, beyond a reasonable doubt, *at least one* of the above[-]numbered conditions [in Jury Instruction 13]." (Emphasis added.) *See Galvan*, ¶ 22. However, one of the numbered conditions that the prosecution needed to disprove was that "[Thompson] was not the initial aggressor."

¶ 32 As relevant to the erroneous instruction, the prosector argued during closing argument that Thompson knew he was the initial aggressor, and that's why he didn't want to involve law enforcement. This is because, the prosecutor argued, the entire chase started because Thompson threw the bottle — though defense counsel countered that the thrown bottle was not a sufficient act of initial aggression.

¶ 33    Furthermore, when referring to the initial aggressor instruction, the prosecutor said, "[I]f [Thompson] is the initial aggressor, [he] do[es]n't get to jump into a fight here and then claim self-defense or the need to use self-defense." According to the prosecutor, Thompson made "an aggressive movement" that "elevat[ed] the situation to the next level," and Thompson's allegedly getting out of his car before P.H., actively looking for P.H., and carrying a gun on his hip all showed that Thompson acted as the initial aggressor.

¶ 34    Consequently, the prosecutor's statements prejudicially suggested that the jury should "try to fit facts into an erroneously given instruction" by finding Thompson the initial aggressor. *Castillo*, ¶ 61. Given the prosecution's prompting, there is a reasonable possibility that the jury was misled into applying the initial aggressor instruction, avoiding deciding if the prosecution disproved at least one of the other affirmative defense conditions, and then arriving at the conviction. *Cf. Kaufman v. People*, 202 P.3d 542, 562 (Colo. 2009) ("During deliberations, it is possible that the jury may have wondered why it was given the instruction, decided that it must have been for some purpose, and forced the

16

evidence to fit the instruction, thereby denying [the defendant] his claim to self-defense.").

¶ 35    To illustrate the point, contrast *Manzanares* with the situation here.  942 P.2d at 1241.  There, the division held that the trial court had no evidentiary basis for providing an initial aggressor instruction.  *Id.*  However, the division deemed the error harmless because there was not a reasonable possibility that the instruction misled the jury for two reasons.  *Id.*  First, the jury acquitted the defendant of the crimes that required the same intent needed by the initial aggressor instruction.  *Id.*  And second, the prosecutor made no reference to the initial aggressor instruction and made no attempts to characterize the defendant as the initial aggressor.  *Id.*

¶ 36    Here, though, nothing within the instructions necessarily prevented the jury from finding Thompson guilty after first deciding that he was the initial aggressor.  And the prosecutor did reference the initial aggressor instruction during closing argument, characterizing Thompson as the initial aggressor.  *See Castillo*, ¶ 60 ("[W]e have recognized that errors regarding jury instructions can be 'exacerbated by the prosecution's misleading comments during

its closing argument.'" (quoting *People v. Garcia*, 28 P.3d 340, 346 (Colo. 2001)).

¶ 37     Nonetheless, the People argue that the instruction could not have misled the jury because the evidence was overwhelming that Thompson did not act in self defense, implying that the jury necessarily would have reached the same verdict without the error. And to be sure, there is significant evidence aligned against Thompson's affirmative defense — especially the evidence regarding a third shot.  It's also true that we cannot conclusively determine whether the jury, in fact, applied the initial aggressor instruction or if it instead found that the People had disproved at least one other condition for the affirmative defense.

¶ 38     Still, the People's position overlooks the standard of reversal that controls our decision.  "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error."  *People v. Mendenhall*, 2015 COA 107M, ¶ 49 (alteration omitted) (quoting *Blecha v. People*, 962 P.2d 931, 942 (Colo. 1998)).  Accordingly, whatever the likelihood of a guilty verdict, the references to

overwhelming evidence disproving the affirmative defense fail to show that the jury surely did not disregard the affirmative defense after it found that Thompson was the initial aggressor. Thus, the People fail to rule out the reasonable *possibility* that the jury's verdict rested on the erroneous instruction. *See Hagos*, ¶ 11; *cf. Mendenhall*, ¶ 46 ("When there is legal error as to one basis for finding an element, the submission of an alternative theory for making that finding cannot sustain the verdict *unless it is possible to determine the verdict rested on the valid ground.*" (alteration omitted) (emphasis added) (quoting *United States v. McKye*, 734 F.3d 1104, 1110 n.6 (10th Cir. 2013)).

¶ 39 Therefore, because the People cannot meet their heavy burden of disproving the reasonable possibility that the jury's reliance on the initial aggressor instruction contributed to the conviction in this case, we must reverse. *See Hagos*, ¶ 11; *People v. Beasley*, 778 P.2d 304, 306 (Colo. App. 1989) (holding that the trial court reversibly erred by giving an erroneous initial aggressor instruction because "the court may have induced the jurors to characterize the defendant as the first aggressor even though another individual actually started the conflict and thereby unjustifiably to conclude

that defendant lost his right of self-defense"), *abrogated on other grounds by*, *Riley*, 266 P.3d at 1094.

## B. Remaining Contentions

¶ 40    Thompson also contends that the prosecutor committed reversible misconduct during voir dire and closing argument, and the court improperly limited objections during closing argument. We do not address these arguments because they are unlikely to arise in the same context on remand. *See People v. Gillespie*, 2024 COA 98, ¶ 56.

## III. Disposition

¶ 41    The judgment is reversed, and the case is remanded for a new trial.

JUDGE J. JONES and JUDGE MOULTRIE concur.