Opinion by Judge GRAHAM.
¶ 1 Defendant, Tenarro Banks, appeals his judgment of conviction entered upon a jury verdict finding him guilty of first degree murder and his sentence of life imprisonment without parole. We affirm the judgment, affirm the sentence in part and vacate it in part, and remand to the trial court for resentencing.
I. Background
¶ 2 On December 11, 2004, defendant, then age fifteen, attended a house party in a neighborhood connected with the Tre Tre Crips gang. Defendant was a member of the gang. Defendant confronted the sixteen-year-old victim about his wearing colors of the rival Bloods gang, and the owner of the house ended the party asking party-goers to leave. Once outside, defendant shot and killed the victim.
¶ 3 Defendant was charged as an adult with first degree murder after deliberation pursuant to section 18-3-102(1)(a), C.R.S.2012. The first jury trial resulted in a mistrial. On December 4, 2007, following a second jury trial, defendant was convicted and sentenced to life imprisonment without parole, pursuant to section 18-1.3-401(1)(a)(V)(A) and (4), C.R.S.2012.
II. Issues on Appeal
¶ 4 Defendant raises eight issues on appeal, arguing that (1) the trial court erred in denying his motion for mistrial and permitting the prosecution to question a witness regarding an assertion of the privilege against self-incrimination; (2) the trial court erred in denying two motions for mistrial and admitting five recorded statements containing inadmissible material; (3) the trial court violated defendant's federal and state constitutional rights to due process and to confront witnesses; (4) the trial court erred by permitting the prosecution to repeatedly refer to a known gang member who was a defendant in an unrelated high-profile murder case; (5) the trial court erred in permitting testimony about a witness's agreement to take a polygraph test; (6) the trial court violated defendant's right to a fair and impartial jury when it denied his challenges for cause regarding two jurors; (7) the cumulative impact of the errors at trial violated defendant's right to a fair trial; and (8) the mandatory sentence of life imprisonment without parole constitutes cruel and unusual punishment and violates *424 defendant's rights to equal protection and due process. We address each contention in turn.
A. Motion for Mistrial: Testimony Regarding Right to Silence
¶ 5 We reject defendant's first assertion that the trial court erred by denying his motion for mistrial based upon the prosecution's questioning of Gregory Strickland about the invocation of his Fifth Amendment privilege against self-incrimination.
1. Standard of Review
¶ 6 We review a trial court's denial of a motion for a mistrial for abuse of discretion. Dunlap v. People, 173 P.3d 1054, 1091 n. 39 (Colo.2007). An abuse of discretion occurs only if a ruling is manifestly arbitrary, unreasonable, or unfair. People v. Welsh, 176 P.3d 781, 790 (Colo.App.2007). "A mistrial is warranted only if the prejudice to the defendant is so substantial that it cannot be remedied by other means." People v. Lehmkuhl, 117 P.3d 98, 104 (Colo.App.2004) (citing People v. Abbott, 690 P.2d 1263 (Colo.1984) ).
2. Facts
¶ 7 Gregory Strickland, a friend of defendant, had been sentenced to eight years in the Arapahoe County Jail for aggravated robbery. While incarcerated, Strickland was facing further charges and disciplinary action by the jail when he was found with a weapon (a "shank") in his possession. He then wrote a note to his jailers, seeking special dispensation in exchange for information (a "kite"). In the kite he described in detail the facts and events of the shooting and named defendant as the shooter. He did not sign the kite, and it is disputed whether he gained this knowledge first hand, through his contacts from jail, or otherwise.
¶ 8 The following day, Strickland was contacted by Detective Castro. He gave the detective a recorded statement that followed the facts of his kite. Afterward, the jail enforced only minimal disciplinary action against Strickland.
¶ 9 At defendant's first trial, which resulted in a mistrial, Strickland was not granted immunity and testified that he lied in the kite and his statement to Detective Castro. At the second trial, Strickland invoked his privilege against self-incrimination, and the prosecution requested witness immunity pursuant to section 13-90-118, C.R.S.2012. The court agreed and issued an order compelling Strickland to testify.
¶ 10 On direct examination, Strickland stated that he did not want to testify and that he had been subpoenaed and granted immunity. He agreed that he had been interviewed by Detective Castro on audiotape in October 2005 but testified that either he did not remember the statements he made or he had lied to Detective Castro. He further testified that he lied in the kite because he "had got caught with a shank."
¶ 11 On cross-examination, Strickland again testified that he was testifying under immunity, and he agreed that he had similarly testified at the first trial without immunity. He further testified that he had been approached on two different occasions, one being that very morning, by an investigator from the district attorney's office, who suggested his former trial testimony was untrue and threatened to file charges against him if he did not testify consistently with his recorded statements.
¶ 12 On redirect examination, the prosecutor asked Strickland, "You were advised this morning by the DA investigator that you had a right of self-incrimination [sic], didn't you?" In a bench conference, the prosecutor explained that he wanted to inquire about Strickland's interaction with the investigator and his "assertion of the Fifth" in order to rebut the cross-examination. The trial court responded that it would "allow some limited inquiry."
¶ 13 Redirect examination resumed, and Strickland agreed that "after [he] met with the DA investigator, the Court appointed [him] an attorney." The prosecutor then asked, "And after meeting with [the defense attorney], you decided you wanted to assert your Fifth Amendment right to protect yourself from incrimination?" Strickland did not answer the question.
*425 ¶ 14 In another bench conference, defense counsel objected to the fact that Strickland would be "asserting his Fifth in front of the jury," which was "the whole thing [counsel] tried to avoid in the first place." The prosecutor responded, "This is rebuttal exactly to the whole charge he brought up, the whole immunity fact ... he says he has to protect himself because he's lying." At that point, defense counsel moved for a mistrial. While the court denied the motion, it responded, "[W]e are on shaky ground here. You can indicate he was granted immunity, don't go much beyond that."
3. Analysis
¶ 15 "The Fifth Amendment provides a witness with a privilege to decline to answer questions if the answers would incriminate him or her." People v. Smith, 275 P.3d 715, 720 (Colo.App.2011) ; see U.S. Const. amend. V ; see also Colo. Const. art. 2, § 18. "[A] prosecutor commits reversible error if, knowing that an accomplice will claim the privilege against self-incrimination, he calls the accomplice to the stand for the purpose of extracting the claim of privilege from him." People v. Newton, 966 P.2d 563, 569 (Colo.1998) (quoting Billings v. People, 171 Colo. 236, 242, 466 P.2d 474, 477 (1970) ).
¶ 16 Initially, we distinguish the case at hand from Newton. In Newton, the prosecution called the witness to the stand "for the purpose of extracting the claim of privilege." Id. The witness then invoked his Fifth Amendment privilege a total of fifteen times during examination. Id. at 571.
¶ 17 Here, the prosecution did not call Strickland to the stand to extract the claim of privilege. In fact, the prosecution did not raise the subject on direct, inquiring only into Strickland's grant of immunity. Defense counsel then cross-examined him extensively about that immunity, suggesting that Strickland had lied in the kite but told the truth at the first trial. On redirect examination, the prosecutor asked about the privilege for the purpose of "rebuttal exactly to the whole charge that he brought up, the whole immunity fact himself in his cross-examination." In other words, the prosecutor sought to rebut the defense theory that Strickland's testimony about lying was truthful. The prosecutor sought to show that with immunity, Strickland had no need to fear prosecution.
¶ 18 We note from the record that Strickland never invoked his Fifth Amendment privilege on the stand. While the prosecution asked Strickland, "And after meeting with [the defense attorney], you decided you wanted to assert your Fifth Amendment right to protect yourself from incrimination?" Strickland never answered the question, and the prosecution did not mention the issue of privilege again for the remainder of trial.
¶ 19 In light of the fact that Strickland did not invoke his Fifth Amendment privilege at trial, we discern no reason to apply the Newton factors to our analysis here. See id. at 569-70.
¶ 20 Furthermore, we perceive no prejudice to defendant based on this inquiry. One policy behind the prohibition against asking a witness about invoking the privilege is to prevent the jury from drawing a negative inference about the witness's character or credibility. See People v. Welsh, 58 P.3d 1065, 1070 (Colo.App.2002), aff'd, 80 P.3d 296 (Colo.2003).
¶ 21 Here, Strickland's credibility was impeached by his admission to having three prior felony convictions, see § 13-90-101, C.R.S.2012 ("the conviction of any person for any felony may be shown for the purpose of affecting the credibility of such witness"), being incarcerated at the time of trial, and lying to an officer. Thus, the prosecution's question would have no practical further prejudicial impact on Strickland's credibility.
B. Motion for Mistrial: Recorded Statements
¶ 22 We also reject defendant's second assertion that the trial court erred by denying his two motions for mistrial based on the cumulative effect of introducing five recorded statements containing potentially inadmissible evidence.
1. Standard of Review
¶ 23 "A mistrial is a drastic remedy, and a trial court's ruling on a motion *426 for mistrial will not be disturbed on appeal absent a gross abuse of discretion." Lehmkuhl, 117 P.3d at 104 (citing People v. Haymaker, 716 P.2d 110 (Colo.1986) ). "A mistrial is warranted only if the prejudice to the defendant is so substantial that it cannot be remedied by other means." Id. (citing Abbott, 690 P.2d 1263 ). Additionally, we review a trial court's evidentiary rulings for abuse of discretion. Welsh, 176 P.3d at 790. An abuse of discretion occurs only if a ruling is manifestly arbitrary, unreasonable, or unfair. Id.
¶ 24 "[I]f the defendant lodges no objection to the evidence or procedure, then we consider the error only under the plain error standard." People v. Miller, 113 P.3d 743, 749 (Colo.2005).
¶ 25 Plain error review addresses error that is both "obvious and substantial" and requires reversal only if the error so undermined the basic fairness of the trial as to cast serious doubt on the reliability of the judgment, and the defendant bears the burden of persuasion. Id. at 750.
2. Preservation for Appeal
¶ 26 The parties agree that the issue regarding the admissibility of prior consistent and inconsistent statements was preserved for review as defense counsel moved for a mistrial twice and objected to the admission of the videotapes on hearsay grounds. However, the parties disagree as to whether the issues of relevance and prejudice were properly preserved. We agree with the People and conclude that defendant's objections at trial were not specific enough to preserve these issues. People v. Rodriguez, 209 P.3d 1151, 1156 (Colo.App.2009) ("An objection must be specific enough to provide the trial court with a meaningful opportunity to prevent or correct error."), aff'd, 238 P.3d 1283 (Colo.2010). Therefore, we review such issues under the plain error standard. Miller, 113 P.3d at 749.
3. Analysis
¶ 27 Defendant argues that the tapes of recorded witness interviews contain inadmissible testimonial evidence. These recordings were provided to defense counsel prior to trial, but no objections to them were lodged until the trial. The testimony is sometimes rambling and contradictory and can be separated into three types of statements: (a) prior inconsistent statements; (b) prior consistent statements; and (c) potentially irrelevant and prejudicial statements.
a. Prior Inconsistent Statements
¶ 28 Defendant contends that the trial court abused its discretion by admitting the recorded statements of Eshawn Pettigrew, Michael Baker, and Gregory Strickland, in which they gave statements to the police describing in detail the events leading up to the shooting and naming defendant as the shooter. We conclude that the trial court did not err in admitting the recorded interviews of these three witnesses because the interviews contained prior inconsistent statements that were admissible.
¶ 29 A prior inconsistent statement by a witness is admissible not only to impeach the testimony of the witness, but also as substantive evidence of the fact to which the testimony and the inconsistent statement relate if the following foundational requirements are met: (1) the witness, while testifying, was given an opportunity to explain or deny the statement; and (2) the previous inconsistent statement purports to relate to a matter within the witness's own knowledge. § 16-10-201, C.R.S.2012; see Montoya v. People, 740 P.2d 992, 996 (Colo.1987).
¶ 30 Additionally,
CRE 801(d)(1)(A) ... provides that a statement is not hearsay if the declarant testifies at the trial or hearing and is subject to crossexamination, and the statement is inconsistent with his testimony. There is no requirement, as there is under the corresponding federal rule, that the prior statement have been given under oath. Although a prior inconsistent statement meeting the definitional components of CRE 801(d)(1)(A) is no longer subject to a hearsay objection, it still remains a prior inconsistent statement and thus subject to the foundation requirements of other provisions of the Colorado Rules of Evidence *427 or statutory law governing the admissibility of such statements.
Montoya, 740 P.2d at 996 n. 3.
¶ 31 All three witnesses testified at trial and were subject to crossexamination. Pettigrew testified during cross-examination at the first trial[1] that Terrance Duckworth was the shooter; Baker testified at the second trial that he had not seen the shooting; and Strickland testified that he had lied in his previous statements when he named defendant as the shooter. However, in the prior recorded statements, all three witnesses said they were at the party, gave a detailed account of the party and the events leading up to the shooting, and named defendant as the shooter. Referring to Pettigrew's recorded statement, the trial court concluded,
I agree under [ section] 16-10-201 his prior statements to Det. Castro, which were inconsistent with his statements at the trial, are admissible to impeach his testimony.... I think basically there is a different testimony given inconsistent with what he told Det. Castro as to who the shooter was, as to where certain people were at certain times, as to circumstances surrounding the shooting.
This reasoning applies to all three witnesses' statements.
¶ 32 All three witnesses were given "an opportunity to explain or deny" their previous recorded statements, as they were questioned about them on direct and cross-examination. § 16-10-201(1)(a), C.R.S.2012. Further, each statement "purports to relate to a matter within the witness's own knowledge," § 16-10-201(1)(b), C.R.S.2012, because each witness admitted to being at the party and identified defendant from a photo array. Thus, the foundational requirements of section 16-10-201, were met, and so the statements were admissible not only to impeach the testimony of the witnesses, but also as substantive evidence of the fact to which the testimony and inconsistent statements relate.
¶ 33 Therefore, the trial court did not abuse its discretion by admitting the three recorded statements as prior inconsistent statements.
b. Prior Consistent Statements
¶ 34 Defendant next contends that the trial court abused its discretion by admitting the recorded interviews of Raheem Riley and Rashad Jones, in which they named defendant as the shooter. We conclude that the trial court did not err in admitting the recorded interviews of these two witnesses because they contained prior consistent statements.
¶ 35 Under CRE 801(d)(1)(B), a prior statement is not hearsay if the declarant testifies at trial and is subject to cross-examination, the statement is consistent with the declarant's testimony, and it is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. Prior consistent statements may also be used for rehabilitation when a witness's credibility has been attacked, and such statements need not comply with CRE 801(d)(1)(B). People v. Eppens, 979 P.2d 14, 21 (Colo.1999).
¶ 36 "The determination of how much of a prior consistent statement is admissible is based upon its relevance and probative use." People v. Elie, 148 P.3d 359, 362 (Colo.App.2006) (citing People v. Halstead, 881 P.2d 401 (Colo.App.1994) ). "If the impeachment goes only to specific facts, then only prior consistent statements regarding those specific facts are relevant and admissible." Id. "However, if the impeachment is general and not limited to specific facts, then the jury should have access to all the relevant facts, including consistent and inconsistent statements." Id.
¶ 37 Here, both witnesses made initial statements to the police naming Terrance Duckworth as the shooter. Both witnesses subsequently made recorded statements naming defendant as the shooter. On direct examination, the witnesses again named defendant *428 as the shooter. Defense counsel brought up the initial statements on cross-examination to impeach the witnesses, and the witnesses admitted that they had first named Duckworth as the shooter immediately after the shooting. The defense also questioned the witnesses regarding their motive for lying, thereby bringing into question the general truthfulness of the witnesses.
¶ 38 In regard to Riley's recorded statement, the trial court ruled, "[B]asically the overall [sic] what he was saying was challenged as not being truthful. I think a prior [consistent] statement is to corroborate his testimony here in court. So for that purpose, Riley's tape is to be admissible." As for Jones's recorded statement, the trial court ruled, "I believe it would be admissible as a prior consistent statement." We agree with the trial court.
¶ 39 Defense counsel argued that the witnesses lied to protect themselves or to help with their other prosecutions, thereby questioning the overall truthfulness of the witnesses regarding all of their statements. Therefore, the recorded statements could be "used for rehabilitation." Eppens, 979 P.2d at 21. Furthermore, the impeachments were not limited to specific facts, and so all of the prior statements were relevant and admissible to give the jury a complete picture of both witnesses' credibility. See Elie, 148 P.3d at 362 ; see also CRE 106 (when a part of a recorded statement is introduced by a party, an adverse party may require the introduction of other parts of the recorded statement which ought to be considered to place the recording in context). Thus, the trial court did not abuse its discretion by admitting the recorded statements as prior consistent statements.
c. Potentially Irrelevant and Prejudicial Statements
¶ 40 For the first time on appeal, defendant contends that the trial court abused its discretion by admitting the recorded statements because they were irrelevant and prejudicial. Because defense counsel did not object specifically on these grounds, "we consider the error only under the plain error standard." Miller, 113 P.3d at 749. We conclude that the admission of these statements did not rise to the level of plain error.
¶ 41 CRE 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Unless otherwise provided by constitution, statute, or rule, all relevant evidence is admissible. CRE 402. CRE 403, however, authorizes a court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Trial courts have broad discretion to make evidentiary determinations under CRE 401 and CRE 403." People v. Melillo, 25 P.3d 769, 773 (Colo.2001).
¶ 42 In denying defendant's first motion for mistrial based upon his assertions of error on other grounds, the trial court concluded:
In reference to the various videos that have been played, really each video has consistencies and inconsistencies with what the witnesses have said in court.... It would be impossible to try to pick out the consistencies versus inconsistencies and destroy the context.
And really the benefit [is] to both sides, if all of these statements vis a vis testimony given here in court, so I think there is really no way to redact other than the redaction that's already been done.
Secondly, it's pretty clear from all the witnesses that the shooting was-is gangrelated, whether or not [the victim] was a member of a gang or not is perhaps not proven, but certainly it appears part of the motivation was gang involvement. And these are gang members, gang affiliated individuals who certainly, based upon their experience in what appears to be months and if not years with gang involvement, they certainly are in a position to say, yeah, these types of words, ... these types of actions, who was at the party *429 seem to be gang related and precipitated the ultimate shooting.
So I think they are certainly in a position to give that opinion or how it appeared to them.
¶ 43 We now address the potentially prejudicial or irrelevant information in Pettigrew's, Baker's, and Strickland's recorded statements. Defendant contends that three specific statements in Pettigrew's testimony were prejudicial or irrelevant: (1) his statement that a life sentence in Colorado is "not so long"; (2) his description of defendant as someone who should pay for what he did and his reference to defendant by use of an obscene and demeaning name; and (3) his statements indicating that he did not want to testify in court.
¶ 44 The first statement is not prejudicial as the jury was properly instructed that it was the court's role to determine the appropriate punishment, and the jury was not to consider the matter. We assume the jury followed the trial court's instructions. People v. Oram, 217 P.3d 883, 895 (Colo.App.2009), aff'd, 255 P.3d 1032 (Colo.2011).
¶ 45 Nor has defendant shown how the second statement unduly prejudiced him any more than the other testimony describing him as a notorious gang member who shot a person numerous times, killing him. That the witness thought defendant should suffer the consequences of his actions and used an obscenity to describe defendant does not appear to have unduly aroused the jury's emotions of prejudice, hostility, or sympathy. In our view, any potential prejudice did not rise to the level of plain error, as it did not "so undermine [ ] the fundamental fairness of the trial ... as to cast serious doubt on the reliability of the judgment." Miller, 113 P.3d at 750 (quoting People v. Sepulveda, 65 P.3d 1002, 1006 (Colo.2003) ).
¶ 46 The third statement was nearly identical to Pettigrew's testimony at the first trial and, as prior sworn testimony, it was properly admitted. See CRE 804(b)(1). Defendant had ample opportunity to review that testimony and lodge proper and wellfounded objections. No prejudice attended the admission of that statement.
¶ 47 Defendant next contends that Baker's recorded interview contained five specific statements that were prejudicial or irrelevant: (1) his statement that he heard the victim was a "church kid" or a "school kid" and not in a gang; (2) his statement that an individual named "Marlo" had gone to jail; (3) his description of how the victim looked as he died; (4) the interrogating detective's use of the term "gangster"; and (5) Baker's attorney's nodding in response to Baker's comments.
¶ 48 The first statement is cumulative of Pettigrew's testimony from the first trial, which was read during the second trial, and is relevant to the issue of whether the shooting was gang related.
¶ 49 The second statement is not material but the irrelevance does not suggest any particular prejudice. Again, defendant does not explain how the incarceration of "Marlo" was unfairly prejudicial.
¶ 50 The third statement, describing how the victim looked when he died, was simply cumulative of exhibits 2, 3, 4, 5, and 6 showing the deceased victim and his numerous bullet wounds. Exhibits 3, 4, 5, and 6 were admitted without objection. Although defendant objected to exhibit 2, its admission is not appealed here.
¶ 51 The fourth statement, the use of the term "gangster," was a legitimate use, given the unrefuted testimony regarding the involvement of the Tre Tre Crips gang.
¶ 52 The fifth "statement" was not an oral statement at all. The attorney's nod was apparently an affirmation of Baker's statement. In any event, it was not offered for the truth of the matters Baker asserted. See People v. Isom, 140 P.3d 100, 103 (Colo.App.2005) ("There is no right of confrontation or hearsay preclusion when statements are offered, not for their truth, but to provide context for the declarant's statements.").
¶ 53 Defendant next contends that Strickland's recorded interview had sixteen specific statements that were prejudicial or irrelevant:
*430 (1) his statement that he heard defendant "was going somewhere" the day after the shooting; (2) his statement that "a bunch of women" had asked him "why [his] homeboy killed [their] homeboy"; (3) his statement that he had been told that either a person named "Feragie" or defendant had an El Camino; (4) his statement that someone else was arrested on this case, possibly "Feragie"; (5) his statement that defendant was going to change his gang moniker; (6) his statement that "Feragie" "got three years" and was going to be testifying in a Denver case; (7) his statement that "Gaffie" was a rat; (8) his statement that "the plan was originally everybody" was going to jump the victim at the party; (9) his statement that "GG" was being talked about "in the pod"; (10) his statement that "everybody says" that Baker drove defendant away from the scene; (11) the detective's reference to "an Eastside roller coaster"; (12) his statement that "Quintan" was heavily armed; (13) his statement that defendant always carried more than one gun but that "Feragie" might have been holding the second gun on the night in question; (14) his statement that Baker had shot at some people; (15) his statement that he was afraid of "Feragie"; and (16) his statement that defendant said "we" had to go bury the gun.
¶ 54 The large number of these assertions of error suggests to us that trial objections would have been lodged had counsel believed that the statements were prejudicial. Defense counsel was furnished with the recorded interviews prior to trial and had the opportunity to listen to and evaluate the statements. Instead of asking for relief in limine, counsel lodged only hearsay objections. We view the assertions of error against this background.
¶ 55 The first, second, fourth, and eleventh statements are cumulative of other testimony at trial and defendant has not shown how they prejudiced him. The third, fifth, sixth, seventh, ninth, twelfth, fourteenth, and fifteenth items are not material. However, defendant has not shown how these irrelevant statements prejudiced him. Defendant has not shown how the eighth and tenth statements were prejudicial, and they could have helped his defense by showing that others were involved in the crime. The thirteenth statement is cumulative of other testimony stating that defendant had a gun that night, and the fact that other people were potentially armed or that there were other shooters could have benefited the defense. Finally, the sixteenth statement could have come in as an admission of a party opponent, CRE 801(d)(2), and was relevant in corroborating other testimony that defendant had help disposing of the murder weapon.
¶ 56 Defendant also contends that the detective's questioning during Strickland's recorded interview was improper. However, these statements by the detective were admitted for context and not for the truth of the matter asserted. Isom, 140 P.3d at 103 ; see CRE 106.
¶ 57 Defendant next contends that Riley's recorded interview had six specific statements that were prejudicial or irrelevant: (1) his fear that he could be harmed for providing information to the police; (2) his identification of defendant from a photo array; (3) his statements about gang dynamics; (4) his statements concerning the size of the gun and the number and timing of the gunshots; (5) his statement that he heard defendant was in jail; and (6) his statement that a classmate, "Y.C.," had died.
¶ 58 The first, second, third, and fourth statements were all relevant to the case and his testimony, and were discussed in his testimony at trial. Furthermore, "evidence of a witness's fear of retaliation is admissible to explain his or her change in statement or reluctance to testify." People v. Villalobos, 159 P.3d 624, 630 (Colo.App.2006). The fifth statement is cumulative of other testimony that defendant was in jail and it was not unfairly prejudicial. The sixth statement is irrelevant but defendant has not shown how it was prejudicial.
¶ 59 Defendant next contends that Jones's recorded interview contains two specific statements that were prejudicial or irrelevant: (1) his statement that he is afraid of being taken away from his one-year-old daughter and that his family might be endangered because he is testifying; and (2) his *431 statements indicating that defendant wanted to kill Duckworth.
¶ 60 The first statement was relevant regarding Jones's reluctance to testify and was admissible to "explain his ... change in statement or reluctance to testify." Id. Defendant has not shown how the second statement was prejudicial, and considering that the defense's theory of the case was that defendant was framed by Duckworth as the shooter, the statement demonstrates anger toward Duckworth which does not in itself implicate defendant in the murder of the victim. Thus, it is not inconsistent with defendant's theory and would appear to be beneficial to his defense.
¶ 61 Defendant also contends that the detective's questioning was improper and testimonial; however the questioning was properly admitted for context. Isom, 140 P.3d at 103. We are unable to see how the interview could be understood without the context of the detective's questions.
¶ 62 Because Riley's and Jones's truthfulness was disputed, their prior statements were relevant and admissible to give the jury a complete picture of both witnesses' credibility. See Elie, 148 P.3d at 362.
¶ 63 Additionally, defense counsel and the prosecutor agreed to redact portions of the recordings. Defendant did not request the court to make any further redactions prior to trial.
¶ 64 Finally, the trial court ruled:
Unfortunately with all these tapes there is a lot of hearsay, speculation, but they all deal with what these witnesses said they saw or didn't see, where they were or where they weren't. They are very rambling. Almost impossible to cut out hearsay statements really without destroying the context which it was given.... So I think the difficulty of the type of statements we are dealing with, this is the best that could be done. They [could] have been redacted piecemeal, much more precise in presenting it to the jury, but I think this type of case it would be impossible.
¶ 65 Thus, the trial court used its "broad discretion to make evidentiary determinations under CRE 401 and CRE 403," Melillo, 25 P.3d at 773, in an effort to provide a contextual basis for the statements.
¶ 66 In conclusion, the trial court did not abuse its discretion in admitting the five recorded interviews. First, the bulk of the statements in these interviews were prior inconsistent or consistent statements and the required foundational elements were met. Furthermore, in regard to the potentially prejudicial or irrelevant material, most of the statements were cumulative of other testimony or provided context, and defendant did not meet his burden of persuasion in showing how the statements prejudiced him. Thus, the trial court did not abuse its discretion in admitting the recorded interviews or in denying defendant's two motions for mistrial based on the statements.
C. Confrontation Clause
¶ 67 We reject defendant's third assertion that the trial court violated his federal and state constitutional confrontation rights by admitting the five recorded interviews addressed above.
1. Standard of Review
¶ 68 We review a potential violation of the Confrontation Clause for constitutional harmless error. Bernal v. People, 44 P.3d 184, 200 (Colo.2002) (citing Blecha v. People, 962 P.2d 931, 941-42 (Colo.1998) ). "To be classified as constitutional harmless error, a court must be confident beyond a reasonable doubt that the error did not contribute to the guilty verdict." Id. "The constitutional harmless error test 'is not whether, in a trial[ ] that occurred without error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.' " Id. at 200-01 (quoting Blecha, 962 P.2d at 942 ).
2. Preservation for Appeal
¶ 69 Generally, we decline to consider arguments under the state constitution unless the defendant argued at trial that the state constitution provides greater protection than the federal constitution. People v. Mershon, 874 P.2d 1025, 1030 n. 2 (Colo.1994)
*432 (because defendant failed to argue that the state constitution provides greater protection, the court considers the argument solely under the federal constitution); People v. Gann, 724 P.2d 1318, 1320 (Colo.1986) (where defendant's motion to dismiss refers generally to "due process" and the district court fails to make any specific reference to the Colorado Constitution in its order of dismissal, this court must presume that both the motion and the lower court's ruling were based exclusively on federal constitutional standards).
¶ 70 On appeal, defendant argues that the court violated both his federal and state constitutional rights to confront witnesses. However, defense counsel did not argue that the Colorado Constitution provided greater protection and only objected on federal constitutional grounds by citing Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Therefore, we only address defendant's federal constitutional claim.[2]
3. Analysis
¶ 71 The Supreme Court has held that out-of-court testimonial statements are not admissible under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. Crawford, 541 U.S. at 59, 124 S.Ct. 1354.
¶ 72 Initially, we note that the five recorded statements are testimonial in nature. Id. at 52, 124 S.Ct. 1354 ("Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard."). Furthermore, all of the witnesses, minus Pettigrew, were available for the second trial where defense counsel cross-examined them. Therefore, the trial court did not violate defendant's right to confront witnesses by admitting those four recorded statements, and defendant's only remaining claim concerns Pettigrew's recorded statement.
¶ 73 The trial court ruled that Pettigrew was unavailable, holding, "Based upon the evidence presented to the Court, and also in view of Court Exhibit No. 1, the Court would find [the] district attorney's office made every reasonable good faith effort to secure the appearance of Mr. Pettigrew at trial, but despite these efforts was unable to do so." The court also noted:
[B]ased on experience, plus common sense, ... serving someone closer to trial rather than a month out ... would be the best procedure with an uncooperative witness.... So it's very clear that serving someone much in advance of trial, especially Mr. Pettigrew, based on his own statements would not have been the best procedure because the subpoena would have been lost or disregarded.
After reviewing the record, we agree with the trial court.
¶ 74 Mike Walker, an investigator working for the district attorney's office, had searched for Pettigrew for three weeks. Pettigrew had an active warrant for his arrest, but Walker was unable to find him in jail, through phone numbers provided by Pettigrew's former probation officer, or at any of the addresses found in court and department of labor records.
¶ 75 Joey Perez, a police officer, attempted to locate Pettigrew the day before the trial using his last known address. Perez visited Pettigrew's grandmother and Baker's grandmother. After the visits, Perez received phone calls from an individual identifying himself as Pettigrew and saying that he would not be testifying again.
¶ 76 Based on the above information, we agree with the trial court that the prosecution made a good faith effort to obtain Pettigrew's presence at trial, and therefore, Pettigrew was unavailable. See Ohio v. Roberts, 448 U.S. 56, 74, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) ("[A] witness is not 'unavailable' for purposes of the ... exception to the confrontation requirement unless the prosecutorial authorities have made a good faith *433 effort to obtain his presence at trial." (quoting Barber v. Page, 390 U.S. 719, 724-25, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) )), overruled on other grounds by Crawford, 541 U.S. at 36, 124 S.Ct. 1354.
¶ 77 Moreover, Pettigrew was subject to prior cross-examination at the first trial. The trial court ruled:
Now in reference to the transcript that I reviewed from the prior trial, it appears Mr. Pettigrew did testify at some length and that he was subject to cross-examination by defense counsel. It appears that there was really no limitation placed. In other words, his testimony was fully explored by both the district attorney and the defense counsel and he had completed his testimony at the time he was released....
¶ 78 Therefore, because Pettigrew was unavailable and was subjected to prior cross-examination, defendant's Confrontation Clause rights were not violated and the trial court did not err by admitting Pettigrew's recorded statement.
D. Evidentiary Issues
¶ 79 We also reject defendant's fourth assertion that the trial court erred regarding two evidentiary issues: (1) by allowing repeated testimony regarding Brian Hicks, who was connected to a highprofile murder case in Denver; and (2) by allowing testimony about Jones's polygraph test.
1. Standard of Review
¶ 80 We review a trial court's evidentiary rulings for abuse of discretion. Welsh, 176 P.3d at 790. An abuse of discretion occurs only if a ruling is manifestly arbitrary, unreasonable, or unfair. Id.
2. Analysis
a. Brian Hicks
¶ 81 Defendant contends that referencing Brian Hicks was unduly prejudicial.
¶ 82 As noted above, CRE 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Unless otherwise provided by constitution, statute, or rule, all relevant evidence is admissible. CRE 402. CRE 403, however, authorizes a court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Trial courts have broad discretion to make evidentiary determinations under CRE 401 and CRE 403." Melillo, 25 P.3d at 773. Additionally, "evidence of a witness's fear of retaliation is admissible to explain his or her change in statement or reluctance to testify." Villalobos, 159 P.3d at 630.
¶ 83 At trial, defense counsel argued:
Mr. Hicks has nothing to do with this case. This is all speculation on the part of these people. It's simply to inflame the passion of the jury because it is pretty common knowledge Mr. Hicks is the suspect in the Darrent Williams, the former Denver Broncos, case.... [T]here is no connection here.
¶ 84 After reviewing the record, we conclude that evidence of Hicks's involvement in the case at hand was relevant and was not unduly prejudicial. Sergeant Vince Lombardi first identified Hicks when he testified that Hicks was an "OG[3] with the Tre Tre." Cleus Williams, a Tre Tre Crips member, testified that Hicks goes by "Solo" or "S" and that defendant "was his little homey." Detective Castro then testified that Williams identified the location where defendant asked Hicks to dispose of the murder weapon. Jones later testified that defendant was "hooked up" and closely related to Hicks, which caused Jones to fear testifying.
¶ 85 Detective Castro then testified that, on a recording of defendant's prison telephone conversations, defendant "says that S, Brian Hicks, is giving money to his mom but his mom is spending it." Detective Castro *434 further testified that defendant referenced Hicks in twenty-four similar phone calls. Investigator Daniel Elster mentioned Hicks briefly in his testimony. Finally, in closing, the prosecution mentioned Hicks twice while referencing his involvement in disposing of the murder weapon.
¶ 86 The testimony regarding Hicks was relevant to show Hicks's relationship with defendant; Jones's fear of testifying, see Villalobos, 159 P.3d at 630 ; and the disposal of the murder weapon. At no point during the trial was Hicks's involvement in any other case mentioned.
¶ 87 Thus, we agree with the trial court that the testimony regarding Hicks was relevant and its relevance was not outweighed by the danger of unfair prejudice. Therefore, the trial court did not abuse its discretion by admitting such testimony.
b. Polygraph Testimony
¶ 88 Defendant further contends that the trial court abused its discretion by allowing testimony that Jones changed his story when faced with taking a polygraph. We disagree.
¶ 89 Lie detector or polygraph evidence is per se inadmissible in a criminal trial. People v. Dunlap, 975 P.2d 723, 756 (Colo.1999). However, the mere reference to such testing does not require a mistrial. People v. Kerber, 64 P.3d 930, 933 (Colo.App.2002) (citing United States v. Blaze, 143 F.3d 585 (10th Cir.1998) ), disapproved of on other grounds by Domingo-Gomez v. People, 125 P.3d 1043 (Colo.2005) ; People v. Preciado-Flores, 66 P.3d 155, 163 (Colo.App.2002) (trial court did not abuse its discretion in denying mistrial where jury was inadvertently informed defendant had taken a lie detector test, but was not told result of the test).
¶ 90 The Kerber division identified several factors that should be considered in determining whether reversal is required: (1) whether the defendant objected or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was an attempt to bolster a witness's credibility; and (5) whether the results of the test, rather than only the fact that a test was conducted, were admitted. Kerber, 64 P.3d at 933. "While these factors are not exclusive and not all are relevant in every case, we view them as useful guidance in resolving the issue before us." Id.
¶ 91 Prior to opening statements, the prosecution indicated it was going to mention that Jones had changed his testimony when faced with taking a polygraph, but emphasized that no results of the test would be mentioned. Defense counsel objected, arguing that the prejudicial effect would outweigh any probative value of the evidence. The trial court admitted the statement, ruling:
First of all, I think the issue-the fact that there was a change in his testimony when confronted with the polygraph is relevant and probative as to motivation as to why he might have said-decided to change it during-when confronted with the polygraph, which is arguably a truth-seeking mechanism. If you want to develop it wasn't ever done, there was no polygraph, that sort of thing can be gone into. That's strong motivation, whether you believe him or not, it's intimidating, even if they are telling the truth. But certainly if someone is not-isn't telling the truth, I don't know where the truth lies, obviously. But to modify or change, try to conform to what the polygraph may or may not reveal, even though he didn't take it.
....
I believe it's relevant and probative. I think the jury can give it whatever weight they choose to. But I think it is something that would influence the average person one way or the other in terms of whatever statements they are giving to the police. You certainly can develop that it wasn't given, if you choose to. That would be fine. The results I would not allow in because there is case law, some states allow it, but not Colorado.
¶ 92 In opening statement, the prosecution mentioned that Jones had changed his statement prior to taking a polygraph examination. Over defense objection, Jones testified that after he had given a statement to the detective and named Duckworth as the shooter, he had agreed to take a polygraph. He further testified that while waiting for the *435 exam to begin, he asked to talk with the detective again, and he told the detective, "[T] he statement I gave was a lie, I was ready to tell him the truth."
¶ 93 On cross-examination, defense counsel asked Jones whether he actually ever took a polygraph test[4] , and Jones said that he did. Detective Castro later testified that Jones had first identified Duckworth as the shooter, but after Jones agreed to take a polygraph examination, "he wanted to come clean" and identified defendant as the shooter.
¶ 94 In initial closing argument, the prosecutor reminded the jury, "When is it [Jones] decided to get off the lie about [Duckworth]? When? When confronted with the polygraph. Maybe he has a conscience." In rebuttal, the prosecutor again argued, "Watch [Jones] on the video when he says they're about to hook [him] up to the polygraph machine and at that point in time they will know [he was] lying about [Duckworth]."
¶ 95 Here, defense counsel objected to the mention of the polygraph examination but did not request a limiting instruction. The prosecutor referred to the testimony in closing only in order to show Jones's motivation for changing his story. The references sought to impeach his prior statements. Furthermore, no polygraph results were admitted and defense counsel elicited the only testimony regarding whether a polygraph test was actually performed. The evidence was not focused on any actual polygraph being taken and no implication that anyone either passed or failed a polygraph was made.
¶ 96 Therefore, we conclude that the reference here was relevant and not unduly prejudicial. Thus, the trial court did not abuse its discretion in admitting such testimony.
E. Challenges for Cause
¶ 97 We reject defendant's fifth assertion that the trial court erred when it denied his challenge for cause regarding two jurors.
1. Standard of Review
¶ 98 We review a trial court's ruling on a challenge for cause for an abuse of discretion. Carrillo v. People, 974 P.2d 478, 487 (Colo.1999) ; People v. O'Neal, 32 P.3d 533, 535 (Colo.App.2000). We give deference to the trial court's assessment of the prospective juror because of its perspective in evaluating the demeanor and body language of the juror. Carrillo, 974 P.2d at 487 ; O'Neal, 32 P.3d at 535. We will overturn a court's ruling on a challenge for cause only if the record presents no basis to support it. O'Neal, 32 P.3d at 535.
2. Analysis
¶ 99 A trial court must grant a challenge for cause if a prospective juror is unable or unwilling to accept the basic principles of criminal law and to render a fair and impartial verdict based on the evidence admitted at trial and the court's instructions. People v. Lefebre, 5 P.3d 295, 299 (Colo.2000) ; People v. Mack, 33 P.3d 1211, 1217 (Colo.App.2001). However, the abuse of discretion standard acknowledges "that the trial judge is the only judicial officer able to assess fully the attitudes and state of mind of a potential juror by personal observation of the significance of what linguistically may appear to be inconsistent or self-contradictory responses to difficult questions." People v. Sandoval, 733 P.2d 319, 321 (Colo.1987).
¶ 100 Defense counsel challenged both Juror H and S for cause. After the trial court denied the challenges for cause, the defense exercised peremptory challenges against the two jurors, and the defense exhausted its available peremptory challenges.
a. Juror S
¶ 101 During voir dire, the prosecutor asked, "Does anyone else feel ... that street gang affiliation really causes such a hesitancy that you would not be able to listen to the testimony of witnesses and make a decision in the case?" Juror S responded:
After listening to everything yesterday and being home in the evening, I would be *436 thinking about the safety aspect of it, being in this courtroom and what the court does to ensure our safety.... But in terms of listening fairly and making a decision or synthesizing the information, I don't have any problem with that. I was just thinking more about the logistics of it once we leave here all of what happens.
¶ 102 The prosecution then asked, "Are you comfortable now with that aspect of your personal safety?" Juror S responded, "No, because it really hasn't been addressed. But I don't know what the procedure is in this court. But I'm sure once you have updated me or anyone else that may be thinking about it, I will feel comfortable once you tell me what the procedure is."
¶ 103 During defense counsel's questioning, Juror S indicated that she thought she would be a fair and objective juror but again raised the matter of juror safety at the end of defense counsel's questioning. The trial court then informed Juror S what procedures were in place to ensure the jurors safety.
¶ 104 Defense counsel challenged Juror S for cause based upon her concerns for juror safety. The prosecution objected that the trial court addressed the juror's concerns and Juror S seemed to be satisfied. The trial court ruled:
I agree. [Juror S] expressed concerns other jurors had expressed in various ways in terms of the gang concerns about safety. And when I explained to her in more detail the precautions that were taken or are available, she was not-she nodded her head and in my mind she looked relieved and accepted that, and was nodding her head, did seem to have allayed her fears. She did say throughout that she could be fair. She felt it was an important civic duty. I'm going to deny the challenge for cause for [Juror S].
¶ 105 Defendant now argues that Juror S's concerns for her safety show bias and partiality in that she believes defendant is dangerous. However, Juror S maintained that she could be fair and impartial throughout questioning. Juror S's main concern was her safety, which the trial court properly addressed, and the record so reflects.
¶ 106 Therefore, the trial court did not abuse its discretion in denying defendant's challenge for cause regarding Juror S.
b. Juror H
¶ 107 During voir dire, the prosecutor asked, "If you heard from witnesses who were admitted members of a street gang, would you be able to listen to their testimony and judge their credibility?" Juror H responded, "I'm afraid I would be biased because the affiliation aspect, that there would be bias in terms of the street gang members being in agreement perhaps with other street gang members in terms of activity, be what it may." The prosecution then asked, "Do you think you could give a fair trial in a case where a great number of witnesses were gang members? Would you be able to be fair to both sides?" Juror H answered, "No."
¶ 108 Defense counsel then challenged Juror H for cause based upon his statements concerning evaluating the credibility of gang members' testimony. The trial court provisionally denied the challenge, saying that if the Juror H were seated, the court would follow-up.
¶ 109 After each side exercised their ten peremptory challenges, Juror H was called into the jury box, where the trial court addressed him:
You had said at one point you had concerns about being fair in this case, as some other jurors expressed because of the issue of gang members testifying, street gangs, things of that nature.
Do you believe that you could be fair to both sides here? Understanding that you need to factor in obviously the person, their background, how they present and all of that, and evaluate their credibility?
Do you believe you can do that and be fair and impartial to both sides, as to any witnesses who might testify?
Juror H responded, "Yes, I believe so."
¶ 110 Here, the record reflects that Juror H told the court that he could be fair despite the concerns he had expressed. Therefore, we give deference to the trial court's conclusion that the juror's assurance of fairness *437 outweighed his statements of previous doubt, and the trial court did not abuse its discretion in denying defendant's challenge for cause regarding Juror H.
F. Cumulative Error
¶ 111 We also reject defendant's sixth assertion that the cumulative impact of the prosecution's and the trial court's errors requires reversal.
¶ 112 "When individual errors in a trial do not require reversal, but in the aggregate show the absence of a fair trial, reversal is required." People v. Caldwell, 43 P.3d 663, 673 (Colo.App.2001). However, "individual rulings that adversely affect a party, if not determined to be erroneous, cannot serve as the basis for reversal under a cumulative error analysis." People v. Clark, 214 P.3d 531, 543 (Colo.App.2009), aff'd, 232 P.3d 1287 (Colo.2010).
¶ 113 Therefore, because we have not discerned any error in this case, we reject defendant's contention.
G. Sentence
¶ 114 Defendant's last contention is that the trial court violated his Eighth Amendment right against cruel and unusual punishment by sentencing him to life imprisonment without parole pursuant to section 18-1.3-401(1)(a)(V)(A) and (4). Under Miller v. Alabama, 567 U.S. 460, 469, 132 S.Ct. 2455, 2463, 183 L.Ed.2d 407 (2012), which concluded that juvenile offenders may be deprived of their Eighth Amendment rights when they are sentenced to life without parole, we agree that defendant should be resentenced.
1. Standard of Review
¶ 115 We review constitutional challenges to sentencing determinations de novo. Lopez v. People, 113 P.3d 713, 720 (Colo.2005).
2. Preservation for Review
¶ 116 Defendant concedes that he did not raise a constitutional challenge to his sentence prior to this appeal but that the matter may be reviewed here as plain error. The prosecution argues that we should not address the issue, citing People v. Cagle, 751 P.2d 614, 619 (Colo.1988), which holds that "[i]t is axiomatic that this court will not consider constitutional issues raised for the first time on appeal." Even if the prosecution is correct, courts have discretion to address unpreserved constitutional issues on appeal if "doing so will promote efficiency and judicial economy." Hinojos-Mendoza v. People, 169 P.3d 662, 667-68 (Colo.2007) (citing People v. Wiedemer, 852 P.2d 424, 433 n. 9 (Colo.1993) ).
¶ 117 Addressing defendant's constitutional challenge to his sentence in this instance will promote efficiency and judicial economy because (1) it can be reviewed as a matter of law apart from a fully developed factual record; (2) the remedy for the error would be merely vacating the sentence in part and remanding for resentencing, not reversing and ordering a retrial, see Sepulveda, 65 P.3d at 1008 ; and (3) the purpose of conserving judicial resources by affording the trial court an opportunity to correct error and thereby avoid a retrial does not apply here, as defendant could not have raised a challenge under Miller prior to sentencing since the case had not been decided then. Therefore, we address defendant's constitutional challenge to his sentence.
3. Analysis
¶ 118 Defendant was sentenced pursuant to section 18-1.3-401(4)(a), C.R.S.2012, which mandates life imprisonment without parole for anyone "sentenced for a class 1 felony, for an act committed on or after July 1, 1990." However, after defendant's sentencing, in 2006, the statute was amended to include section 18-1.3-401(4)(b)(I) and (II), C.R.S.2012, which state:
(I) Notwithstanding the provisions of [ section 18-1.3-401(1)(a)(V)(A) ] and notwithstanding the provisions of [ section 18-1.3-401(4)(a) ], as to a person who is convicted as an adult of a class 1 felony following direct filing of an information or indictment in the district court pursuant to section 19-2-517, C.R.S., or transfer of proceedings to the district court pursuant to *438 section 19-2-518, C.R.S., the district court judge shall sentence the person to a term of life imprisonment with the possibility of parole after serving a period of forty calendar years. Regardless of whether the state board of parole releases the person on parole, the person shall remain in the legal custody of the department of corrections for the remainder of the person's life and shall not be discharged.
(II) The provisions of this paragraph (b) shall apply to persons sentenced for offenses committed on or after July 1, 2006.
See Ch. 228, sec. 2, 2006 Colo. Sess. Laws 1052.
¶ 119 At the time of defendant's sentencing, the applicable statute regarding parole was section 17-22.5-104(2)(d)(I), C.R.S.2012, which states, "No inmate imprisoned under a life sentence for a class 1 felony committed on or after July 1, 1990, shall be eligible for parole." In 2006, the parole statute was amended to include subsection (IV), which states:
Notwithstanding the provisions of subparagraph (I) of this paragraph (d), an inmate imprisoned under a life sentence for a class 1 felony committed on or after July 1, 2006, who was convicted as an adult following direct filing of an information or indictment in the district court pursuant to section 19-2-517, C.R.S., or transfer of proceedings to the district court pursuant to section 19-2-518, C.R.S., may be eligible for parole after the inmate has served at least forty calendar years. An application for parole shall not be made or considered during the period of forty calendar years.
§ 17-22.5-104(2)(d)(IV), C.R.S.2012; see Ch. 228, sec. 3, 2006 Colo. Sess. Laws 1052-53.
¶ 120 The Eighth Amendment's prohibition of cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." Miller, 567 U.S. at 469, 132 S.Ct. at 2463 (quoting Roper v. Simmons, 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ). That right "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned' " to both the offender and the offense. Id. (quoting Roper, 543 U.S. at 560, 125 S.Ct. 1183 ).
¶ 121 Miller held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Id. at 479, 132 S.Ct. at 2469. However, Miller did not categorically ban life imprisonment without parole sentences for all juvenile homicide offenders, id. at 482, 132 S.Ct. at 2471, and the Court further recognized a judge or jury could also choose "a lifetime prison term with the possibility of parole or a lengthy term of years." Id. at 487-88, 132 S.Ct. at 2474-75.
¶ 122 Nevertheless, Miller sets out a new rule invalidating the mandatory denial of parole for juvenile offenders who are sentenced to life in prison. Id. "When a [Supreme Court decision] results in a 'new rule,' that rule applies to all criminal cases still pending on direct review." Schriro v. Summerlin, 542 U.S. 348, 351, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (citing Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) ).
¶ 123 Because defendant was a minor when the court mandatorily sentenced him to life imprisonment without the possibility of parole, and because his case is still pending on direct review, we hold that Miller applies. Therefore, the no-parole provisions contained in sections 18-1.3-401(4)(a) and 17-22.5-104(2)(d)(I), as applied to defendant, are unconstitutional, in that they deny defendant the opportunity of parole.
¶ 124 Colorado has a longstanding general severability clause, codified in section 2-4-204, C.R.S.2012, which provides:
If any provision of a statute is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the statute are valid, unless it appears to the court that the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court determines that the valid provisions, standing alone, are incomplete *439 and are incapable of being executed in accordance with the legislative intent.
¶ 125 This section has been found applicable to "any legislative act not containing a specific severability provision," People v. Vinnola, 177 Colo. 405, 414, 494 P.2d 826, 830 (1972) (applying former § 135-1-5, a predecessor to § 2-4-204 ), and therefore applies to sections 18-1.3-401(4)(a) and 17-22.5-104(2)(d)(I).[5]
¶ 126 "Whether unconstitutional provisions are excised from an otherwise sound law depends on two factors: (1) the autonomy of the portions remaining after the defective provisions have been deleted and (2) the intent of the enacting legislative body." Montezuma Well Serv., Inc. v. Indus. Claim Appeals Office, 928 P.2d 796, 798 (Colo.App.1996) (citing City of Lakewood v. Colfax Unlimited Ass'n, 634 P.2d 52 (Colo.1981) ).
¶ 127 Here, restricting the applicability of the last sentence of section 18-1.3-401(4)(a) and the first sentence of section 17-22.5-104(2)(d)(I) to adult offenders would not affect the viability of the remainder of the provisions, the statutes, or the felony sentencing scheme. The provision of section 18-1.3-401(4)(a) that is now inapplicable to juvenile offenders is neither dependent upon nor inseparable from the remaining provisions in the subsection. Further, while section 17-22.5-104(2)(d)(I) would be inapplicable to juvenile offenders, subsection (2)(c) would be applicable, as it states:
No inmate imprisoned under a life sentence for a crime committed on or after July 1, 1985, shall be paroled until such inmate has served at least forty calendar years, and no application for parole shall be made or considered during such period of forty years.
§ 17-22.5-104(2)(c), C.R.S.2012.
¶ 128 Moreover, restricting the two provisions discussed above to adult offenders follows the "intent of the enacting legislative body." Montezuma, 928 P.2d at 798. Here, the legislative intent with respect to the penalty for juvenile offenders convicted as adults of class 1 felonies, including parole eligibility, is ascertained by reading the plain language of sections 18-1.3-401(4)(a) and 17-22.5-104(2)(d)(I). Together, these provisions demonstrate the general assembly's intent to impose the most serious penalty that is constitutionally permissible for such offenders.
¶ 129 After Miller, the only statutorily authorized penalty fitting that description is life imprisonment with the possibility of parole after forty calendar years. Therefore, applying the life imprisonment provision of subsection (4)(a), as well as the accompanying parole provision of subsection (2)(c), would be constitutional under Miller and would effectuate the "intent of the enacting legislative body." Montezuma, 928 P.2d at 798.
¶ 130 Furthermore, in 2006, the legislature amended the statutes adding sections 18-1.3-401(4)(b) and 17-22.5-104(2)(d)(IV), both of which require the identical penalty of life imprisonment with the possibility of parole after forty calendar years, for all juveniles convicted of a class 1 felony committed after July 1, 2006. Thus, the legislative intent supports sentencing defendant to life imprisonment with the possibility of parole after forty calendar years.
¶ 131 Therefore, we affirm defendant's sentence as to life imprisonment but vacate it to the extent he is denied the possibility of parole, and remand the case to the trial court to modify the sentence by including a provision for the possibility of parole after forty years in accordance with section 17-22.5-104(2)(c). See People v. Johnson, 13 P.3d 309, 313 (Colo.2000) ( "Although ... parole is a part of the overall 'sentencing regime,' it is a distinct element of sentencing, separate from the terms of imprisonment or length of sentence imposed by the trial court.")
III. Conclusion
¶ 132 The judgment of conviction is affirmed. The sentence is vacated to the extent it denies the possibility of parole, it is *440 otherwise affirmed, and the case is remanded for resentencing consistent with our opinion.
CASEBOLT and FURMAN, JJ., concur.

Pettigrew was unavailable for the second trial, and so his testimony from the first trial was read in court. Defendant contends that this violated his Confrontation Clause rights, and we address that argument below.

We note, however, that Colorado has adopted the federal standard from Crawford and defendant's state constitutional claim would rise or fall with his federal constitutional claim. See Compan v. People, 121 P.3d 876, 884 (Colo.2005) (citing People v. Fry, 92 P.3d 970, 976 (Colo.2004) ).

An "OG" is "[s]omeone who has been in the gang for a long time."

Defense counsel's own question actually implicates the results of the test, whereas Jones's testimony does not suggest that he actually took the test. See Kerber, 64 P.3d at 933.

While section 18-1.3-401 has a severability clause, it only applies "[i]n the event the death penalty as provided for in this section is held to be unconstitutional." § 18-1.3-401(5), C.R.S.2012.